# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2920

_____

| | |
|---|---|
| Dimitri Prokopenko, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | *   Petition for Review of an Order of |
| | *   the Board of Immigration Appeals. |
| John Ashcroft, Attorney General | * |
| of the United States, | * |
| | * |
| Respondent. | * |

_____

Submitted:  May 14, 2004
Filed:  June 16, 2004

_____

Before MURPHY, HEANEY, and MAGILL, Circuit Judges.

_____

MURPHY, Circuit Judge.

Dimitri Prokopenko petitions for review of a decision of the Board of Immigration Appeals denying his requests for asylum, withholding of removal, and relief under the Convention Against Torture.  He argues that he has been and will be persecuted in Georgia on account of his Russian ethnicity and Baptist religion.

Prokopenko, a 25 year old ethnic Russian and citizen of Georgia, belongs to an active Baptist family.  Although he has never been baptized, he occasionally attended a Baptist church in Georgia.  Several members of his family received asylum

in the United States in the 1990s because of religious persecution in Georgia; they had all been active in the Baptist Church. At the time of the hearing, his mother and younger sister remained in Georgia, and no evidence was presented to suggest that they were then being persecuted on account of their religion or ethnicity.

Prokopenko entered the United States on April 3, 1999 on a tourist visa with authorization to remain until October 2, 1999. The month before his visa was to expire, he filed an affirmative asylum application with the Immigration and Naturalization Service (INS) alleging that he had suffered and feared persecution in Georgia because of his ethnicity and religion. An asylum officer interviewed him and then referred him for commencement of removal proceedings. He was served with a notice to appear on December 23, 1999, charging him with removability for having overstayed his visa. Prokopenko then conceded removability at a hearing on April 6, 2000, but sought asylum, withholding of removal, relief under the Convention Against Torture,[1] and voluntary departure.

A hearing was held before an immigration judge (IJ) on May 9, 2001. Prokopenko testified that from an early age he had suffered persecution in Georgia on account of his religion. In 1986 the director of his elementary school in Tblisi repeatedly asked his mother why she took him to church, and his first grade teacher once humiliated him before the class for being a Baptist and hit him with a pointing stick. Prokopenko's family moved to Lagodehi, Georgia in 1987, and he has not claimed to have suffered persecution there. In 1994 they returned to Tblisi where Prokopenko attended culinary school, and he says his fellow students harassed him

---

[1]Although his petition raised a claim for relief under the Convention Against Torture, Prokopenko points to no evidence in the record to suggest a probability that he would be tortured within the meaning of the Convention if removed to Georgia. See 8 C.F.R. §§ 208.16(c), 208.18(a)(1). Because there was a lack of evidence in the record to support his Convention claim, we will not address it further.

and started fights. Although his mother attended church regularly upon the family's return to Tblisi, Propokenko attended only occasionally.

Prokopenko also testified that he was repeatedly stopped and harassed by the police in Tblisi because he is Russian. He says that a random bullet grazed his body when a drunken police officer discharged his firearm in 1995, and he was taken by the police to a hospital for treatment. He also testified that police stopped him in October 1997, demanded to see his documents, and then took him to the station for twelve hours where they beat him and said that a Russian should not be walking in that area. He says police stopped him again in July 1998 and again asked for documents. He told them he was not required to carry any, and the police took him to the station where they beat him for eight to twelve hours, reviving him when he became unconscious. He claims he was unable to do anything for about a month after the incident.

The IJ found much of Prokopenko's testimony not credible. It appeared inconsistent with statements he previously made to an asylum officer, and he did not mention any police beatings in his initial asylum affidavit. The IJ also found that it was unlikely Prokopenko would be persecuted on account of his religion because unlike many of his relatives, he had never been active in the Baptist Church in Georgia. Prokopenko's requests for relief were denied on December 20, 2001, and a member of the Board of Immigration Appeals affirmed without opinion on June 30, 2003. Prokopenko timely filed his petition for review.

We treat the IJ's opinion as that of the board when it has affirmed without a written opinion. See 8 C.F.R. § 1003.1(a)(7) (2004); Dominguez v. Ashcroft, 336 F.3d 678, 679 n.1 (8th Cir. 2003).[2] The board's factual determinations must be upheld

[2]Prokopenko argues that the Board improperly affirmed without opinion, but the decision to streamline is not generally subject to judicial review. Ngure v. Ashcroft, 2004 WL 1087149, *9 (8th Cir. May 17, 2004). Moreover, it does not

if supported by reasonable, substantial, and probative evidence on the record considered as a whole. Tang v. INS, 223 F.3d 713, 718 (8th Cir. 2000). Prokopenko had the burden to prove that he had suffered past persecution or had a well founded fear of future persecution in Georgia on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(a) (2002); Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997). He had to present credible evidence to show that a reasonable person in his position would fear persecution if returned to Georgia. See Ghasemimehr v. INS, 7 F.3d 1389, 1390 (8th Cir. 1993) (per curiam). An applicant who fails to establish a well founded fear of persecution also fails under the more stringent standard of proof required for withholding of removal. See Wondmneh v. Ashcroft, 361 F.3d 1096, 1099 (8th Cir. 2004).

Prokopenko argues that he presented sufficient evidence to compel the conclusion that he is eligible for asylum and withholding of removal. He points particularly to his testimony about beatings by the Georgian police and about past religious persecution. He contends that the IJ's credibility findings were tainted by the improper admission of an asylum officer's report containing credibility assessments and were not supported by substantial evidence in the record. He asserts that his account of mistreatment by Georgian police is corroborated by several scars on his face and body, and he also argues that the IJ failed to make findings particularized to his individual circumstances.

Prokopenko contends that the IJ should not have admitted an asylum officer's report containing references to his credibility and that its admission is prohibited by an Operating Policies and Procedures Memorandum (OPPM) then in effect. See

---

violate an alien's due process rights. Loulou v. Ashcroft, 354 F.3d 706, 709 (8th Cir. 2003) (amended Apr. 28, 2004). Even if this decision were subject to judicial review, the board did not err in streamlining its review of Prokopenko's case. See 8 C.F.R. § 1003.1(e)(4)(i).

OPPM 96-1, at *7 (superceded by OPPM 00-01, Aug. 4, 2000). This OPPM stated an internal INS policy that documents containing references to an asylum officer's credibility findings should not be filed with the immigration court, and if filed "the Court Administrator should promptly notify the INS to discontinue any such filings and return those documents to INS . . ." OPPM 96-1, at *7-8. It is doubtful that an internal agency memorandum of this sort could confer substantive legal benefits upon aliens or bind the INS. See Romeira de Silva v. Smith, 773 F.2d 1021, 1024 (9th Cir. 1985) (INS operating instructions are internal directives which do not have the force of law). Cf. Schweiker v. Hansen, 450 U.S. 785, 789-90 (1981) (Social Security Administration not bound by internal claims procedure manual). That issue need not be developed further in this case, however, because here the IJ used the officer's report only as a record of what statements Prokopenko made at the interview. She expressly disavowed any reliance upon the asylum officer's credibility assessments. An IJ is required to "make a de novo determination as to whether there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge, that the alien could establish eligibility for asylum . . ." 8 C.F.R. § 1003.42 (2004). It was not inappropriate for the IJ to take note of Prokopenko's earlier statements to the asylum officer in performing her de novo review of the complete record, as required by the regulation.

Prokopenko argues that the IJ erred in finding that his testimony about ethnic persecution by Georgian police was not credible. Much of her credibility determination was based on inconsistencies between Prokopenko's statements to the asylum officer and those he made at the hearing. Although he told the officer that he had presented his passport to Georgian police when he was stopped in 1997, he testified at his hearing that he was detained and beaten because he had not been carrying his documents. He told the asylum officer that police beat him for three to four hours in 1998, but he later testified that he was beaten for eight to twelve hours. Prokopenko says that what he meant before the asylum officer was that he was held

-5-

until three or four o'clock, but the IJ rejected this explanation and Prokopenko offers nothing to show why it must be accepted.  See INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992).  His asylum application instructed him to "explain in detail" the basis of his claim, but his initial affidavit, prepared with the assistance of an attorney, contains no mention of any beatings by Georgian police.  When an IJ has articulated specific and cogent reasons for disbelieving an alien's testimony, her credibility determinations deserve deference, and that is the case here.  Perinpanathan v. I.N.S., 310 F.3d 594, 597 (8th Cir. 2002).

Prokopenko argues that his testimony was corroborated by scars on his face and body which he received during beatings by the Georgian police, but he failed to support this claim.  An IJ may properly request evidence to corroborate an alien's claims if his credibility is in question.  See Nyama v. Ashcroft, 357 F.3d  812, 817 (8th Cir. 2004).  The IJ requested copies of Prokopenko's treatment records to see what explanation he might have given medical providers in the United States for a scar on his abdomen.  Although the IJ made the request on May 9, it was not until November 2, 2001 that he furnished a spreadsheet showing five instances of medical treatment in the United States.  He did not provide physician notes or medical histories as requested, and there appears to be no evidence that he actually provided the IJ with a signed medical records release since the form in the appellate record is undated and incomplete.  It was Prokopenko's responsibility, not that of the IJ or the INS, to gather evidence in support of his asylum claim.  See Farbakhsh v. INS, 20 F.3d 877, 881 (8th Cir. 1994).  His failure to provide the requested documents to corroborate the source of the scars provided further reason to doubt his credibility.[3]

_____

[3]There were additional examples involving documents which contributed to the IJ's finding that Prokopenko lacked credibility. Prokopenko failed to provide his original Georgian internal passport, and the copy he furnished appeared to have been altered.  Although he claimed on his 1999 visa application that his father would support him during his time in the United States, he eventually supplied a copy of his father's 1993 death certificate.

Prokopenko's claims of persecution on account of his Russian ethnicity were founded principally upon his uncorroborated testimony of police beatings which was found to lack credibility. His claim that he was shot by a drunken police officer in 1995 does not evidence past persecution because it was a random act not premised on Prokopenko's ethnicity or his religion. After studying the record, we conclude that there was substantial evidence to support the IJ's rejection of his claim that he would face ethnic persecution if returned to Georgia.

Prokopenko also renews his argument that he has been and will again be persecuted on account of his Baptist religion. The harassment he described in grade school took place in 1986 during the Communist period, and it abated when his family left Tblisi in 1987. Unlike his relatives who received asylum in the United States, Prokopenko attended church in Georgia only occasionally, was never baptized, and played no prominent role in the church. While there is evidence that Georgian police and security forces have occasionally harassed and beaten members of nonorthodox religious minorities, see U.S. Dept. of State, Bureau of Democracy, Human Rights, and Labor, Country Report on Human Rights Practices for 2000: Georgia, at *12-13 (February 28, 2001), there was substantial evidence to support the IJ's finding that Prokopenko was not an "actively participating Baptist," making it unlikely that he would suffer religious persecution if returned to Georgia. His claim is further undercut by the fact that his mother, an active and baptized member of the Baptist Church, remains in Georgia with his sister and there is no evidence that either is suffering persecution. See In re A-E-M-, 21 I. & N. Dec. 1157 (B.I.A. 1998). There was substantial evidence to support the IJ's finding that Prokopenko did not demonstrate past persecution or a well founded fear of future persecution in Georgia on account of religion.

Prokopenko finally argues that the IJ issued a boilerplate decision which failed to consider the merits of his individual case and that "[c]ookie cutter credibility

findings are the antithesis of the individualized determination required in asylum cases." <u>Parasamy v. Ashcroft</u>, 295 F.3d 1047, 1048 (9th Cir. 2002).  He says that the IJ's decision in his uncle's case is "worded almost identically" to his and argues that her credibility determinations were not tailored to each individual applicant.  We note that there are similarities between the two opinions, but that is not surprising since both applicants raised virtually identical claims and relied on much of the same evidence.  More importantly, the IJ provided individualized credibility determinations in the two cases as required by <u>Parasamy</u>.  After our review we are satisfied that the IJ considered and rejected each of Prokopenko's claims on their own merits.

For these reasons, we deny the petition for review.

_____