# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1171
No. 06-1172

_____

| | | |
|---|---|---|
| Nadejda Pavlovich; Alexandre Ivanovich Shirokov, | * * * | |
| Petitioners, | * * | |
| v. | * * * | Petition for Review of Orders of the Board of Immigration Appeals. |
| Alberto Gonzales, Attorney General of the United States of America, | * * * | |
| Respondent. | * | |

_____

Submitted:  November 17, 2006
Filed: February 14, 2007

_____

Before LOKEN, Chief Judge, MELLOY, Circuit Judge, and SCHILTZ,[*] District Judge.
_____

LOKEN, Chief Judge.

Alexandre Shirokov and his wife, Nadejda Pavlovich, entered the United States as non-immigrant visitors in 1992 and 1993, respectively, and separately applied for asylum, withholding of removal, and relief under the Convention Against Torture. Removal proceedings were initiated against Shirokov in 2000 and against Pavlovich

---

[*]The HONORABLE PATRICK J. SCHILTZ, United States District Judge for the District of Minnesota, sitting by designation.

in 2004.  The proceedings were later consolidated.  After an evidentiary hearing, the Immigration Judge (IJ) denied all relief, designating Russia as the country of removal, with Latvia as an alternative, and granting voluntary departure.  The Board of Immigration Appeals issued separate orders affirming without opinion.  Petitioners have filed a joint petition for judicial review of the final orders of removal.  As the BIA affirmed without opinion, the IJ's decision is the final agency action for purposes of our review.  See 8 C.F.R. § 1003.1(e)(4)(ii); Mohamed v. Ashcroft, 396 F.3d 999, 1003 (8th Cir. 2005).  After careful review of the administrative record as a whole, we conclude that substantial evidence supports the IJ's decision.  Accordingly, we deny the petition for review.

## I. Background

Petitioners were born in areas of the former Soviet Union that are now part of Russia.  They moved with their families to Latvia in 1949 and 1945, when they were children.  Both moved to Moscow in 1964 to attend Moscow State University.  They resettled in Latvia in1969 and lived there until they came to the United States shortly after the Soviet Union collapsed and Latvia became an independent country in 1991.  Petitioners' son currently lives in Novgorod, Russia.  Both have family who continue to live in Latvia.  The Soviet Union issued them passports identifying their nationality as Russian, but they deny either Russian or Latvian citizenship.  Instead, Petitioners claim that, as citizens of the former Soviet Union, they are now "stateless."  See generally Vera v. Gonzales, 160 Fed. App'x 344 (5th Cir. 2005).

Petitioners' asylum claims are based primarily on their Jewish heritage.  Pavlovich presented clear proof that her mother was Jewish.  Shirokov's Soviet-era documents listed his mother as Armenian, but the IJ credited his testimony that she, too, was Jewish.  The IJ denied Petitioners asylum and relief under the Convention Against Torture because, while they suffered some harassment in Latvia on account of their Jewish religion and Russian nationality, they do not have an objective fear of

returning to Latvia. The IJ ordered Petitioners removed to Russia, or alternatively to Latvia, denying them withholding of removal to either country.

## II. Country of Removal

Petitioners first argue that the IJ improperly ordered them removed to Russia and Latvia because neither country is willing to accept them as nationals or citizens. This issue is a rather strange opening argument because the designation of a country of removal necessarily comes after the determination that an alien is not eligible for asylum, withholding of removal, or relief under the Convention Against Torture. See Jama v. Imm. & Customs Enforcement, 543 U.S. 335, 337-38 (2005), where this issue was raised in a collateral habeas proceeding. But the government cites no procedural impediment to our taking up the issue at this time, as we did in Bejet-Viali Al-Jojo v. Gonzales, 424 F.3d 823, 828 (8th Cir. 2005).[1]

The Attorney General's statutory authority to designate a country of removal is found in 8 U.S.C. § 1231(b). As the Supreme Court explained in Jama, when the alien to be removed declines to designate a country of removal, as Petitioners did here, the statute provides that "the Attorney General shall remove the alien to a country of which the alien is a subject, national, or citizen unless the government of the country . . . is not willing to accept the alien into the country." 8 U.S.C. § 1231(b)(2)(D)(ii). Petitioners argue they were citizens of the former Soviet Union but are not citizens of either Latvia or Russia, and neither country will accept them. The IJ cited substantial evidence that Petitioners are eligible for Russian citizenship but have not made a serious effort to become Russian citizens. We need not resolve the citizenship question because we conclude that the Attorney General may designate Russia and

---

[1]The government argues in passing, without citation to authority, that 8 U.S.C. § 1231(h) "prohibits Petitioners from claiming error in the removal country designation." The argument is flatly contrary to Jama, where the Supreme Court considered the merits of such a claim without so much as citing § 1231(h).

Latvia as countries of removal even if Shirokov and Pavlovich are not citizens of either country and neither will accept them.

If an alien who did not designate a country of removal cannot be removed to his or her country of nationality or citizenship, the statute provides that the Attorney General "shall remove" the alien to any country that falls within one of seven categories. 8 U.S.C. § 1231(b)(2)(E)(i)-(vii). Latvia falls within category (i) for Shirokov and category (iii) for Pavlovich because they both lived there before coming to the United States. Russia falls within category (vi) for both because it is the country in which their places of birth are now located. Petitioners may be removed to countries that fall within these categories whether or not they have been "accept[ed] by the destination country." Jama, 543 U.S. at 342. Thus, Russia and Latvia are proper countries of removal.

### III. Relief from Removal

The Attorney General has discretion to grant asylum to a refugee. 8 U.S.C. § 1158(b)(1)(A). A refugee is an alien who is unable or unwilling to return to his or her country of nationality or, in the case of a stateless person, the country in which he or she "last habitually resided," because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In this case, Shirokov and Pavlovich claim no nationality. Therefore, the asylum analysis focuses on Latvia, where they "last habitually resided."

When an alien is not entitled to asylum, removal to a specific county must be withheld if he or she shows a "clear probability" of future persecution on account of a protected ground. Ngure v. Ashcroft, 367 F.3d 975, 989 (8th Cir. 2004). This is "a

more rigorous standard than the well-founded fear of persecution that makes one eligible for asylum." Rife v. Ashcroft, 374 F.3d 606, 613 (8th Cir. 2004). Petitioners argue they are entitled to asylum and withholding of removal to Russia or to Latvia.

## A. Asylum

The right to asylum requires proof of persecution, which we have defined as "the infliction or threat of death, torture, or injury to one's person or freedom" on account of a statutorily protected ground. Ngure, 367 F.3d at 989-90 (citations omitted). We uphold the agency's denial of asylum unless the evidence "was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992). An alien who establishes past persecution is entitled to a presumption that he or she has a well-founded fear of future persecution if removed to that country. 8 C.F.R. § 208.13(b)(1); Awale v. Ashcroft, 384 F.3d 527, 529 (8th Cir. 2004).

**1. Past Persecution**. Petitioners argue that the IJ's opinion is flawed because it lacks an explicit finding regarding past persecution. The absence of that finding has troubled us in other cases because the presumption of a well-founded fear is significant. See Bushira v. Gonzales, 442 F.3d 626, 631-32 (2006); Awale, 384 F.3d at 529-30. However, we do not automatically remand because of the absence of an explicit finding. See Cigaran v. Heston, 159 F.3d 355, 357-58 (8th Cir. 1998).

In this case, Petitioners and the agency were represented by counsel at the evidentiary hearing, and the IJ invited closing argument. Counsel for Petitioners argued first, asserting that they are entitled to asylum because they are stateless,[2] and

---

[2]Petitioners are stateless because "a Russian not living in Latvia when the Soviet Union annexed it in 1940 . . . is not a Latvian citizen." Galina v. INS, 213 F.3d 955, 957 (7th Cir. 2000). However, "statelessness . . . would not by itself be evidence of past persecution." Amin v. Ashcroft, 388 F.3d 648, 651 (8th Cir. 2004); see

because they fear persecution in Russia and Latvia because they are Jewish. Counsel for the agency then argued, focusing in part on the issues to be decided:

> *There is no dispute, there is no past persecution in either Latvia or Russia.* The determination that needs to be made is whether there is a well-founded fear for either one of these individuals to be returned to Russia first, to Latvia second.

(Emphasis added.) In response, counsel for Petitioners *did not disagree* with this definition of the issues to be decided. Thus, the IJ's failure to make an explicit finding of no past persecution is hardly surprising. Petitioners abandoned the issue before the agency and therefore may not raise it on appeal.

Alternatively, the administrative record clearly demonstrates the lack of past persecution. Shirokov testified that co-workers once harassed him and told him to leave Latvia because he was a Jew. After arriving in this country, he received a letter stating that he was fired from his job because he was not a Latvian citizen, and Pavlovich told him that a group of Latvians, one with a knife, tried to force her into a car but fled when bystanders appeared. Pavlovich testified that, after Latvia's independence, she received anti-Semitic fliers threatening to kill her if she remained in the country. Pavlovich worked as a psychologist at a Latvian hospital for ten years but was fired in a purge of all Jews and non-Latvians. Though Petitioners testified that Latvian police would ignore complaints of anti-Semitic harassment, neither suffered physical injury at the hands of Latvian citizens who harassed Jews and Russians. Neither was ever arrested, detained, or questioned by Latvian authorities. Employment discrimination, anti-Semitic flyers, and harassment by private citizens -- even threats and random acts of violence -- are deplorable but do not compel a finding of past persecution. See Suprun v. Gonzales, 442 F.3d 1078, 1080 (8th Cir. 2006);

---

Faddoul v. I.N.S., 37 F.3d 185, 190 (5th Cir. 1994).

Krasnopivtsev v. Ashcroft, 382 F.3d 832, 839 (8th Cir. 2004); Fisher v. I.N.S., 291 F.3d 491, 497-98 (8th Cir. 2002).

**2. Well-Founded Fear of Future Persecution.** Lacking the presumption that proof of past persecution creates, Petitioners must persuade us that no reasonable factfinder could fail to find on this administrative record the requisite well-founded fear of future persecution in Latvia. A well-founded fear must be both subjectively genuine and objectively reasonable. See Mohamed, 396 F.3d at 1003; Ngure, 367 F.3d at 989. The alien must demonstrate fear of either particularized persecution, or of "a pattern or practice . . . of persecution of a group of persons similarly situated" that the alien would likely suffer if he or she was returned to that country. 8 C.F.R. § 208.13(b)(2)(iii)(A)-(B).

The IJ credited Petitioners' testimony that they have a subjectively genuine fear of persecution in Latvia but found that the fear is not objectively reasonable. Petitioners of course disagree. The problems facing Russian Jews in Latvia after that country gained its independence in 1991 are well-chronicled. "About a third of the [Latvian] population consists of Russians who . . . in accordance with a Soviet policy of Russifying conquered territories, moved to Latvia in the wake of the Soviet Union's takeover of the country in 1940. The Russian inhabitants of Latvia are greatly resented by the native Latvians . . . . Any Jew living in Latvia was likely to have been part of the Russian immigration, since the native Jewish population of Latvia had been wiped out by the Nazis . . . ." Galina, 213 F.3d at 956-57. Department of State reports confirm that, to at least some extent, anti-Semitism has accompanied the rise in Latvian nationalism.

Because Petitioners left shortly after Latvia gained its independence and family members continue to live there, Petitioners presented no evidence they are likely to suffer particularized future persecution. Indeed, the fact that Shirokov's brother and Pavlovich's nephew, his wife, and two children continue to live in Latvia tends to

show the absence of likely individualized persecution.  See Prokopenko v. Ashcroft, 372 F.3d 941, 946 (8th Cir. 2004).

Petitioners argue their fear is objectively well-founded because of a pattern and practice of Latvians persecuting Jews.  Petitioners criticize the IJ for relying on State Department reports and urge consideration of media reports of resurgent anti-Semitism.  However, the IJ may reasonably rely on State Department reports assessing the likelihood of future persecution.  See Gebrehiwot v. Ashcroft, 374 F.3d 723, 725-6 (8th Cir. 2004).   The 1998 State Department profile and the 2003 country report document "manifestations of anti-Semitism" in Latvia including vandalism, anti-Semitic sentiment, and repeated bombing of the central synagogue in Riga.  But the reports also note that "[t]he Jewish community generally has religious freedom," and "the Government generally respects this right in practice."  Petitioners in effect argue that media reports since they left Latvia establish that Russian Jews have a well-founded fear of persecution in Latvia as a matter of law.  That argument is contrary to our limited standard of review in the case before us.  We conclude instead that substantial evidence supports the IJ's finding that Petitioners do not have a well-founded fear of future persecution in Latvia on account of their Jewish religion or Russian ethnicity.[3]

## B.  Withholding of Removal

Petitioners further argue they are entitled to withholding of removal to either Russia or Latvia.  As we have explained, they must show a "clear probability" of future persecution to warrant withholding of removal to a specific country.  Because this standard is more onerous than the asylum standard, Petitioners' failure to prove

---

[3]The fact that Pavlovich's sister was granted asylum on a different administrative record did not compel the IJ to find that Petitioners have a well-founded fear of future persecution in Latvia.

a well-founded fear of future persecution in Latvia means they are not entitled to withholding of removal to Latvia. See Rife, 374 F.3d at 613. The issue of withholding of removal to Russia, however, requires separate analysis.

Petitioners have not lived in Russia since the 1960's, and their son is now living in Russia, apparently without suffering harm on account of his Jewish heritage. Thus, Petitioners made no showing of likely individualized persecution. The likelihood Petitioners will suffer future persecution on account of a protected ground is inherently less in Russia than in Latvia because many Latvians resent both Russians and Jews, whereas the issue in Russia is limited to whether Petitioners will be persecuted because they are Jewish. In considering this issue, the IJ reviewed State Department reports of continuing anti-Semitism in Russia but concluded Petitioners "have not adequately demonstrated that their life or freedom would be threatened if they returned to Russia." A threat to "life or freedom" is the statutory standard for withholding of removal. See 8 U.S.C. § 1231(b)(3).

Petitioners argue that the IJ placed too much emphasis on State Department reports and ignored evidence from those reports and other sources of increased "skinhead group membership," openly anti-Semitic educational officials, beatings of Jews, desecration of Jewish cemeteries, synagogue bombings, and inadequate government efforts to prohibit racial and ethnic violence. We have little doubt that isolated, perhaps even frequent incidents of this kind have occurred in a country as vast and as turbulent as today's Russia. But Petitioners' argument, if accepted, would mean that every Russian Jew is entitled to withholding of removal to that country as a matter of law. Petitioners cite no case supporting that proposition, which again is contrary to our limited standard of review. On this administrative record, we conclude that substantial evidence supports the IJ's decision that Petitioners are not entitled to withholding of removal to Russia.

## IV. Conclusion

To us, it seems contrary to the traditions of this great Nation to remove an elderly, law-abiding couple who have spent fifteen productive years in this country to Russia, a country where they have not lived for nearly forty years and whose people do not yet enjoy our levels of economic, political, and religious freedom. But Congress has delegated this judgment to the Executive Branch. We have carefully reviewed the administrative record and concluded that substantial evidence supports the IJ's decisions to deny asylum and withholding of removal and to designate Russia and Latvia as countries of removal. That is the extent of our judicial review authority. Accordingly, we must deny the petition for review.

_____