In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3216

TATIANA FEDOSSEEVA,

*Petitioner-Appellant,*

*v.*

ALBERTO R. GONZALES,

*Respondent-Appellee.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A75 314 733.

ARGUED JUNE 13, 2007—DECIDED JULY 5, 2007

Before COFFEY, FLAUM, and WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* Tatiana Fedosseeva claims that she is "stateless" and thus entitled to asylum in the United States. Born and raised in Russia during the Soviet era, she moved to Latvia as an adult and stayed there after the Soviet Union dissolved. She argues that she is stateless because in 1993 she used her Soviet passport to depart Latvia for the United States without acquiring citizenship in either Latvia or Russia. An Immigration Judge ("IJ") denied Fedosseeva's request for asylum and withholding of removal; the IJ found her not credible and held that she failed to establish past persecution or a well-founded fear of future persecution. The IJ ordered Fedosseeva removed to Latvia or, alternatively, to

Russia, *see* 8 C.F.R. § 1240.12(c), and the Board of Immigration Appeals affirmed the IJ's decision. For the following reasons, we deny her petition for review.

## I. BACKGROUND

Fedosseeva entered the United States as a visitor for pleasure and was authorized to stay until March 1994. She overstayed her visa, however, and in 1997 applied for asylum and withholding of removal. Because Fedosseeva's initial application is not included in the record, we do not know why she first sought asylum. In 1998, she amended her application to claim asylum, not on any of the statutory grounds, *see* 8 U.S.C. § 1101(a)(42)(A), but because she purportedly cannot return to Latvia or Russia, and thus is "stateless." Fedosseeva asserted that she could not return to Russia because she never became a Russian citizen after the collapse of the Soviet Union, and that she could not return to Latvia because she no longer had a "residence permit."

Fedosseeva attached a translated statement to her amended application, noting that she is not fluent in English. In her application, Fedosseeva stated that she moved with her husband from Russia to Latvia in 1984 and remained there with her daughter after the couple divorced. She found employment at a hotel that served many Russians and eventually was promoted to a management position. Around 1990, when Latvia began moving towards liberation from the Soviet Union, native Latvians became hostile towards ethnic Russians. Fedosseeva said that in April 1991, an employee's boyfriend, who was a member of the "zemessardze," a volunteer organization of military reservists similar to a national guard, threatened and assaulted her because she had disciplined the employee. Fedosseeva suffered a nervous breakdown and a

broken wrist as a result of the altercation. Fedosseeva also described a second beating two years later by three men, one dressed as a police officer, who repeatedly kicked her until a nearby bus driver intervened. Approximately a month after the second attack, Latvian police shut off the electricity, gas, and water to her apartment building, and when she tried to turn the gas back on, the police arrested her and fined her the equivalent of $300 for "resisting authority."

In her statement, Fedosseeva also wrote that in 1993, a group of Latvian teenagers harassed and beat her nine-year-old daughter because she is Russian, that the police took no action to assist, and that a Latvian doctor refused to treat her. Fedosseeva eventually decided to leave her daughter with her mother in the Republic of Chechnya in the Russian Federation so she could seek asylum in the United States. At her hearing, Fedosseeva said that her daughter gained citizenship in Russia because she was a minor before the collapse of the Soviet Union. By contrast, Fedosseeva was not eligible for Russian citizenship because she was not a minor and was not residing in Russia during the fall of the Soviet Union.

In 2003, Fedosseeva hired a new lawyer and filed a third "supplemental" application, attaching a new "Sworn Statement" in English. On this asylum application Fedosseeva marked that she is fluent in English. This application said that Fedosseeva moved to Latvia from Russia when she was "very young" because her father was stationed in the Soviet military there. She said that, since the fall of the Soviet Union, anti-Russian sentiment in Latvia against Soviet military families had grown. She stated that she was married in Latvia but stayed behind with their daughter when her husband emigrated to Germany because her father would not let her leave. She also wrote that when she was a manager at the hotel she was attacked by "some members" of the Latvian home

guard—not the boyfriend of the employee she described earlier—because she tried to fire a couple of Latvian employees. She explained that on March 8, 1993, she "was jumped by three men; one was dressed as a Latvian police officer," who beat and kicked her. She attached a transcript of a medical record that stated that she was hospitalized for a week beginning March 8, 1993. She then described an event in which the government shut off the utilities to her building. She defied the government by turning the utilities back on and trying to block officials from coming near, but was subsequently arrested, detained for six hours, and fined the equivalent of $300.

In March 2005, Fedosseeva appeared with counsel at her asylum hearing. Though her counsel said at an earlier hearing that Fedosseeva spoke English, she used a translator at the asylum hearing. Fedosseeva conceded removability, but refused to designate a country of removal because she claimed to be stateless. As the only witness at the hearing, Fedosseeva said that she would not seek asylum from Russia because she believed that Russia would not accept her given that she is not a citizen. She testified that she was not a Russian citizen because only people residing in Russia at the time of the fall of the Soviet Union automatically became citizens. She said that she came to the United States using a Soviet passport that was issued in Latvia in 1993, but she did not explain why Latvia was issuing Soviet passports two years after the collapse of the Soviet Union. She explained—consistent with her first sworn statement but not her second—that she moved to Latvia in 1984 with her daughter and husband for his job. She also said that Latvian residency laws and her father's connection to the Soviet military prevented her from becoming a Latvian citizen. Fedosseeva offered no documentary evidence about the residency or citizenship criteria for either Russia or Latvia.

Fedosseeva also testified that she feared for her life if returned to Latvia because she is an ethnic Russian, and she had "several unpleasant incidents" when she last lived there in the early 1990s. She described one such incident that she said took place in 1992 when several men wearing Latvian home guard uniforms approached her and one of them struck her. She testified that she fell and hit her head, but that because she is Russian, when an ambulance arrived the medics refused to do anything more than bandage her shoulder. She said that because the medics in the ambulance did not "really help," she was forced to get treatment in a nearby "militia station" with medical facilities. Contrary to her 2003 written statement and supporting documents, she testified that she was never hospitalized and returned home after a few hours of treatment. When confronted with her inconsistent statements and supporting documents, she said that she was confused and that maybe the medical reports were for her daughter. However, the medical records listed Fedosseeva's name.

Fedosseeva testified about several other incidents. Specifically, she testified that in 1991 or 1992 the gas, electricity, and water were turned off in her apartment building because, she asserts, the Latvian government did not like that Russians lived there. She said that she turned the gas and electricity back on and guarded the gas pipe with a dog, and had a "very unpleasant dispute" with the police. She said that the police arrested her and fined her the equivalent of $150. Fedosseeva next testified that she was fired from her job at the hotel because she was not fluent in Latvian and because her father was in the Soviet military. The government pointed out, however, that she submitted written documents stating that she consented to being laid off. She did not mention the assault at the hotel that she had described in her earlier applications.

After the hearing, the IJ found Fedosseeva's testimony not credible, reasoning that it was "not sufficiently detailed," "internally inconsistent," and inconsistent "with the facts she set forth in her first application." The IJ noted Fedosseeva's inability to identify consistently when the key events she recounted took place. The IJ also mentioned that her testimony about the beating by Latvian home guard members was not consistent with her application.

The IJ further held that Fedosseeva "failed to present the requisite specific, detailed facts" to establish past persecution or a well-founded fear of future persecution in Latvia. The IJ concluded that the attack that she described seemed to be "the act of a rogue national guard member, not the result of any act perpetrated and condoned by the Latvian government." The IJ also ruled that all of the events that Fedosseeva described amounted only to "harassment by private actors or lawful sanctions imposed by the government for civil disobedience." Finally, the IJ concluded that Fedosseeva did not have an objectively reasonable fear of future persecution because the events occurred more than a decade earlier and the State Department's 2004 country report for Latvia noted that, while discrimination against ethnic Russians still exists, the government does not condone it. The IJ commented that Latvian animosity towards Russians was particularly high in the early 1990s because of the Soviet occupation, but the Latvian government has since tried to accommodate different ethnic groups. The IJ noted that according to the 2004 State Department report, fifteen percent of the members of the Latvian Parliament were ethnic Russians, although the general population consists of 28.5% ethnic Russians. *See* U.S. Dep't of State, Background Note: Latvia (Dec. 2006), available at http://www. state.gov/r/pa/ei/bgn/5378.htm (last visited June 14, 2007)). Moreover, the IJ emphasized the fact that the govern-

ment investigates all claims of human-rights violations. *Id.* Consequently, the IJ ruled that Fedosseeva did not qualify for asylum or withholding of removal and that she should be removed either to Latvia or Russia.

Fedosseeva appealed to the BIA, which affirmed the IJ's conclusions in a brief order.

## II. ANALYSIS

Fedosseeva petitions this Court for review. Because the BIA's decision supplements the IJ's opinion, we review both. *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005). In her petition for review, Fedosseeva asserts that neither Latvia nor Russia will accept her, and that it was error for the IJ to order her removed to either country. We disagree. Fedosseeva's factual premise has no support in the record, and her corresponding legal conclusion is not grounded in any authority. Fedosseeva does not contend that Russia will refuse her citizenship; rather, she testified that she can only apply for Russian citizenship while residing in Latvia, and does not want to return there. In fact, Fedosseeva probably qualifies for a simplified naturalization process in Russia because her mother already is a citizen of the Russian Federation. *See* Federal Law No. 62-FZ on Russian Federation Citizenship (May 31, 2002, as amended 2004), available at http://www. legislationline.org/legislation.php?tid=11&lid=591. Nothing in the record, and nothing in the legal authorities cited in her brief, supports her assertion that she must return to Latvia to apply for Russian citizenship.

In any event, Fedosseeva's argument is irrelevant because, even assuming that she is stateless, that fact is not a ground for asylum. *See Zahren v. Gonzales*, No. 06-1301, 2007 WL 1437469, at *3 (7th Cir. May 17, 2007). To be eligible for asylum, Fedosseeva must demonstrate

that she is a "refugee." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1). Refugees include a "person having no nationality, [who] is outside any country in which such person last habitually resided" and cannot return because of "persecution or a well-founded fear of future-persecution" on account of nationality. *Id.* § 1101(a)(42)(A). Thus, the statute is explicit that even a stateless person must show persecution to be granted asylum.

Once an alien has been denied asylum, the alien can designate a country of removal. 8 U.S.C. § 1231(b)(2)(A); *Zahren*, 2007 WL 1437469, at *2. When the alien does not designate a country of removal, the Attorney General is required by statute to remove the alien to any country where the alien is a "subject, national, or citizen" unless the government of the country refuses to accept the alien. 8 U.S.C. § 1231(b)(2)(D)(ii); *see Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 339 (2005); *Zahren*, 2007 WL 1437469, at *2. When the alien cannot be removed to the country of nationality or citizenship, then the Attorney General is required to designate a country that falls into one of seven categories listed in 8 U.S.C. § 1231(b)(2)(E). *See Pavlovich v. Gonzales*, 476 F.3d 613, 616 (8th Cir. 2007). Here, the Attorney General was permitted to designate Russia as Fedosseeva's country of removal because she was born there. 8 U.S.C. § 1231(b)(2)(E)(iv). Likewise, the Attorney General could have designated Latvia as the country of removal because Fedosseeva entered the United States from Latvia. *Id*. § 1231(b)(2)(E)(I). Fedosseeva may be ordered removed to these countries regardless of whether they have accepted her. *Jama*, 543 U.S. at 342; *Zahren*, 2007 WL 1437469, at *3. Questions about whether the designated country will accept the alien are to be dealt with by the Attorney General after, and independent of, the asylum case. 8 U.S.C. § 1231(b); *see also Zahren*, 2007 WL 1437469, at *3.

The Eighth Circuit recently came to the same conclusion in a nearly identical case. *See Pavlovich*, 476 F.3d at 616. In *Pavlovich*, the petitioners were born in what is now considered Russia but moved to Latvia before the collapse of the Soviet Union. *Id.* at 615. The petitioners argued that the IJ improperly ordered them removed to Russia or, alternatively, Latvia because neither country would accept them. *Id.* In concluding that both countries were proper for removal, the court noted that "the designation of a country of removal necessarily comes after the determination that an alien is not eligible for asylum." *Id.*; *see also Ahmed v. Ashcroft*, 341 F.3d 214, 218 (3d Cir. 2003) (holding that "statelessness alone does not warrant asylum"); *Najjar v. Ashcroft*, 257 F.3d 1262, 1291-92 (11th Cir. 2001) (upholding BIA denial of asylum where the petitioner did not establish that the country designated for removal would refuse her entrance because of her nationality).

Arguably, if the IJ had designated Russia as the country of removal, that would end our inquiry because Fedosseeva has never contended that she cannot safely return to Russia, and her contention that Russia will not accept her is irrelevant at this stage. *See Zahren,* 2007 WL 1437469, at *3. Nevertheless, the IJ designated Latvia as the first choice for removal, and Fedosseeva has argued that she will be persecuted in Latvia. Accordingly, we proceed to analyze her claim.

Substantial evidence supports the IJ's ruling that Fedosseeva did not suffer past persecution in Latvia. An IJ's adverse credibility determination is entitled to deferential review and will be overturned only under extraordinary circumstances. *Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007); *Oforji v. Ashcroft*, 354 F.3d 609, 613 (7th Cir. 2003). We will overturn an IJ's adverse credibility determination if it is not supported by "specific, cogent

reasons" that "bear a legitimate nexus to the finding." *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006) (internal citations and quotations omitted). When an IJ finds an alien's testimony not credible, the alien must provide a convincing explanation for the discrepancies or introduce credible corroborating evidence. *Boyanivskyy v. Gonzales*, 450 F.3d 286, 293 (7th Cir. 2006).

The IJ identified three inconsistencies between Fedosseeva's testimony, written statements, and documentary evidence, which all go to the heart of her claims. *Adekpe v. Gonzales*, 480 F.3d 525, 530 (7th Cir. 2007); *Olowo v. Ashcroft*, 368 F.3d 692, 699 (7th Cir. 2004). First, the IJ noted that Fedosseeva testified that a Latvian home guard member punched her in 1992 and that she was treated by militia and released. The IJ pointed out that her written statement was inconsistent with this account because it did not mention that she received any treatment after the assault, but did mention that the attack took place in 1993, that it involved three guardsmen who kicked her, and that it was stopped by a bus driver. Next, the IJ noted that Fedosseeva testified that authorities turned off the gas, electricity, and water to her apartment building in 1991, though her written statement said that this incident took place two years later in 1993. Finally, the IJ mentioned that Fedosseeva testified that she was fired in 1992 from her position at the hotel because of her ethnicity, but she presented documents that stated that she was actually laid off from the hotel in 1991 "with her written consent." Fedosseeva's explanation for these inconsistencies was that she was "confused" and "unable to recall" the correct dates for these events. The IJ did not credit her explanation, a decision to which we defer when the explanation was not so persuasive that "a reasonable factfinder would have been compelled to accept" it. *See Chen v. Gonzales*, 457 F.3d 670, 673 (7th Cir. 2006).

Moreover, none the incidents involving government actors qualified as persecution. First, Fedosseeva alleged that she was arrested and spent several hours in custody, but not because of any of the five statutory reasons for granting asylum. *See* 8 U.S.C. § 1101(a)(42)(A); *Tamas-Mercea v. Reno*, 222 F.3d 417, 425-26 (7th Cir. 2000). Rather, she said she was arrested because she tried to turn the utilities on for her building in defiance of the government's actions and then confronted the police with a "big dog." Second, Fedosseeva said that home guardsmen attacked her because she is Russian. But substantial evidence supported the IJ's conclusion that this single event, consisting of three men allegedly kicking her, rose only to the level of harassment, not persecution. *See, e.g., Prela*, 394 F.3d at 518 (upholding a finding that several interrogations by the police, 24-hour detainment, harassment for money, and beating causing injury to an alien's hands was not persecution); *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (stating that a single episode of detainment, beating, and deprivation of food for three days did not compel a finding of persecution).

The other incidents Fedosseeva described were not performed or condoned by the Latvian government. *See Hor v. Gonzales*, 421 F.3d 497, 501-02 (7th Cir. 2005) ("You cannot even claim asylum on the basis of persecution by a private group unless the government either condones it or is helpless to prevent it."). For instance, Fedosseeva alleged in her application that an employee's boyfriend threatened and pushed her, but she also said that this was because of a fight she had with the employee—not because of government policy. She also claimed that her employer fired her because of her nationality, but the loss of one job—even if due to ethnicity—is discrimination, not persecution. *Medhin v. Ashcroft*, 350 F.3d 685, 689 (7th Cir. 2003).

Finally, the IJ's conclusion that Fedosseeva does not have an objectively reasonable fear of future persecution is likewise supported by substantial evidence. Without evidence of past persecution, Fedosseeva had to demonstrate that she genuinely fears persecution on account of her nationality and that her fear is objectively reasonable. *See Boci v. Gonzales*, 473 F.3d 762, 767 (7th Cir. 2007). The IJ assumed that Fedosseeva genuinely feared a return to Latvia, but concluded that the fear was not reasonable. The IJ relied on a 2004 State Department report, which stated that fifteen ethnic Russians were sitting in Latvia's 100-member parliament and that the Latvian government was committed to protecting human rights. Moreover, the most recent reports from the State Department, of which we may take notice, *see Giday v. Gonzales*, 434 F.3d 543, 556 n.6 (7th Cir. 2006), state that Latvia has joined the European Union and the North Atlantic Treaty Organization (NATO). *See* U.S. Dep't of State, Background Note: Latvia (Dec. 2006), available at http://www.state.gov/r/pa/ei/bgn/5378.htm (last visited June 14, 2007). The reports note that of the 400,000 people in the country who are classified as non-citizens, fewer than 1,000 were considered "stateless" and thus ineligible for naturalization. U.S. Dep't of State, Country Reports on Human Rights Practices-2006, available at http://www.state.gov/g/drl/rls/hrrpt/2006/78822.htm (last visited June 14, 2007). And a 2003 report states that after Latvia voted by referendum to join the European Union and lowered the requirements for naturalization, 95% of applicants have passed the citizenship test on the first attempt. U.S. Dep't of State, Country Reports on Human Rights Practices-2003, available at http://www.state.gov/g/drl/rls/hrrpt/2003/27847.htm (last visited June 14, 2007). Fedosseeva argues generally that the reports may not be reliable, but she has not presented the requisite specific, detailed facts demonstrating that she has good reason to fear that she

will be singled out for persecution. *See Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003).

Fedosseeva argues that this case is identical to *Galina v. INS*, 213 F.3d 955 (7th Cir. 2000), in which we ruled that the BIA improperly relied on a State Department country report to determine that conditions in Latvia had improved between 1994 and 1998. In *Galina*, the BIA concluded that the petitioner suffered past persecution in Latvia, and we held that the BIA could not conclude that conditions had improved based only on country reports that recounted conditions that were substantially the same as when the petitioner left Latvia. *Id.* at 958. Here, unlike *Galina*, there is substantial evidence to support the IJ's finding that Fedosseeva was not persecuted in the past, so it was not necessary for the IJ to determine whether the conditions in Latvia had improved to the point that her fear of persecution was no longer well founded. 8 C.F.R. § 208.13(b)(1)(i)(A). Moreover, the most recent country reports state that significant changes have occurred in Latvia, including its admission to the European Union and NATO and an increase in the number of Russian members of the Latvian parliament. *See* U.S. Dep't of State, Background Note: Latvia (Dec. 2006), available at http://www.state.gov/r/pa/ei/bgn/5378.htm.

## III. CONCLUSION

For the above reasons, we DENY Fedosseeva's petition for review.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*