NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Argued February 20, 2009
Decided April 8, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| No. 08-2694 | Petition for Review of an Order of the Board of Immigration Appeals |
| ALEKSEJS NOSALS, | |
| *Petitioner*, | No. A98-829-309 |
| *v.* | |
| ERIC H. HOLDER, JR., Attorney General of the United States, | |
| *Respondent*. | |

**O R D E R**

Aleksejs Nosals, an ethnic Ukrainian who was born and has resided in Latvia, traveled to the United States in 2004 to work for the summer. After overstaying his visa, Nosals filed an asylum application and sought withholding of removal and relief under the Convention Against Torture ("CAT"). The asylum officer denied his application, and an immigration judge ("IJ"), after an evidentiary hearing, did the same. The Board of Immigration Appeals dismissed his appeal, and Nosals filed a timely petition for review in this court. For the following reasons, we deny his petition for review.

I.

Aleksejs Nosals was born in Riga, Latvia, in 1983.[1] Though his surname is Latvian, Nosals and his family are not ethnic Latvians; they are of Ukranian descent. Nosals's family has resided in Latvia since at least the time of his birth, and his parents, along with his younger brother, remain there. Nosals's family is part of a significant minority—around forty percent of Latvia's population—that is not ethnic Latvian. Despite being born and raised in Latvia, speaking fluent Latvian, and attending the University of Latvia, Nosals has chosen not to become a Latvian citizen.

Nosals believes that he will be subject to persecution because of his Ukrainian ethnicity if he returns to Latvia. During the hearing before the IJ, Nosals described three incidents that he claims support that belief. First, while he attended the University of Riga in 2002, a group of Latvians hit him from behind, causing him to fall down. Nosals claimed they told him he was "an occupant" and "should go away." He also alleged that they threatened to kill him if he did not leave. Because he was covering his face, Nosals never saw his attackers. Although Nosals put ice on his head when he got home, he admitted that he bore no physical signs of the attack. Nosals testified that he reported this incident to the police but was unable to give the police officers any details about his attackers. The officers told him that they could not help. Nosals did not pursue his complaint any further, and he continued to attend the university.

The second incident occurred in March 2003 when Nosals joined a counter-demonstration protesting a neo-Nazi rally in Riga. The neo-Nazis had obtained governmental approval for their demonstration; the counter-demonstrators had not. According to Nosals, the point of the counter-protest was to stand up against violence. Despite their intention, events took a violent turn when the participants in both rallies clashed. The police were forced to intervene and to separate the groups. Nosals testified that he was beaten by the police, arrested, held in custody for a couple of hours, and fined. After that incident, Nosals returned to the university and continued his studies. A year later he participated in a similar protest without incident.

The third incident occurred in March 2004, shortly after Nosals participated in the second protest. Nosals and a friend were on a train back to Riga when members of Klubs

_____

[1] For purposes of this order we presume that Nosals testified credibly at the hearing before the immigration judge. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). We therefore draw our account of the facts from his testimony at that hearing.

415, a neo-Nazi youth organization, overheard them speaking in Russian.  The neo-Nazis accosted Nosals and his friend, beat them with clubs, and threw them from the train after pressing the emergency stop. Nosals suffered a broken arm and a hairline fracture on his foot.  He received treatment from a local hospital and then went with his friend to the police.  An officer listened to their report and wrote down their claims; however, Nosals could not identify who beat him up, and the police did not open a criminal case.

In addition to those three incidents, Nosals also described an episode involving his parents.  Nosals testified that his parents had attempted to obtain the hospital and police records to support his asylum claim but were refused.  Shortly after Nosals's parents requested the records, a group of men claiming to be police officers came to their house and, after asking a few questions, recommended that Nosals's parents not continue seeking his records.  The next day, his parents discovered graffiti on their door stating "Russians go away to your Russia." Nosals also acknowledged, however, that his parents are still living in Latvia and have never been arrested, harmed, or persecuted in any way.

Neither the IJ, nor the BIA, thought that those four incidents amounted to either past persecution in Latvia or justified a well-founded fear of future persecution there.  In its opinion, the BIA noted that the treatment Nosals received from the police after the counter-protest bore no relation to his ethnicity.  The BIA also found that the other two incidents in which Nosals was physically harmed did not rise to the level of past persecution.   In addition, the BIA found that Nosals had failed to establish a well-founded fear of future persecution. The BIA therefore denied Nosals relief and dismissed the appeal. Nosals timely filed a petition for review in this court.

II.

Because the BIA issued its own opinion rather than merely supplementing or expressly adopting the IJ's decision, we review only the BIA's opinion. *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007).  We will uphold the BIA's denial of relief if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).   Reversal is appropriate only if the record compels granting the applicant asylum.  *See id*.[2]

---

[2] Nosals does not raise any arguments in his petition about either withholding of removal or CAT relief.  We therefore will not address those claims. *See Haxhiu v. Mukasey*, 519 F.3d 685, 692 (7th Cir. 2008).

Asylum is available to persons who have suffered past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007). Nosals first argues that the BIA erred in concluding that the three incidents described above did not meet the standard for past persecution. Persecution is "a high standard and one that is properly difficult to meet without powerful and moving evidence." *Dandan v. Ashcroft*, 339 F.3d 567, 573–74 (7th Cir. 2003). We have defined persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Boci*, 473 F.3d at 766 (citing *Dandan*, 339 F.3d at 573 (citations and quotations omitted)). "Persecution involves harms that go beyond mere harassment; it results from more than simply 'unpleasant or even dangerous conditions in [the applicant's] home country.'" *Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006) (quoting *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005)). While persecution need not be life-threatening, it must at least involve the threat of death, imprisonment, or the "infliction of substantial harm or suffering." *Boci*, 473 F.3d at 766 (*quoting Sharif v. INS*, 87 F.3d 932, 935 (7th Cir. 1996)). In addition, the persecution must stem from governmental action or from groups the government is unable or unwilling to control. *Chatta v. Mukasey*, 523 F.3d 748, 753 (7th Cir. 2008).

The record does not compel a finding that Nosals suffered persecution. First, as the BIA correctly noted, there is no evidence that Nosals's arrest and subsequent short imprisonment after the counter-demonstration was in any way related to his ethnicity. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *cf. Ahmed*, 467 F.3d at 673 ("The bus attack was violent and threatened Ahmed's safety, but it had nothing *directly* to do with his being a Midgan."). Thus, Nosals's claim that he was persecuted on account of his ethnicity boils down to two incidents: the first in which unidentified attackers knocked him down from behind at the university, and the second in which the neo-Nazis accosted him and his friend on the train 18 months later. Those two incidents do not add up to persecution.

With respect to the university attack, Nosals did not present any evidence that he was seriously harmed. Nosals continued to attend the university after the attack, and he made no mention in his testimony before the IJ of any further troubles while he attended school. Although the train incident was more serious, resulting in a broken arm and a hairline fracture in his foot, it occurred more than a year after the attack at the university and bore no relation to that incident. There is no evidence in the record that the train incident was anything other than a random act of violence, which—though regrettable—does not amount to persecution. *Cf. Guardia v. Mukasey*, 526 F.3d 968, 972 (7th

Cir. 2008) (noting that there was no evidence that the attack on the petitioner was "anything other than a random act of violence").

Moreover, there is no evidence that the groups that attacked Nosals had any government connection or sanction. *See Chatta*, 523 F.3d at 753. Indeed, Nosals reported each incident to the police. *Cf. Guardia*, 526 F.3d at 972 (finding it significant that threats against asylum applicant had been reported to the police). Nosals argues that the police's failure to act on his reports shows that the Latvian government was unwilling to control xenophobic violence. The BIA had a more straightforward explanation, however, for the lack of investigation: Nosals was unable to identify any of his attackers. Having examined the record, we do not see anything that compels a contrary conclusion.

Nosals also challenges the BIA's finding that he failed to show a well-founded fear of future persecution if he returned to Latvia. Without evidence of past persecution, Nosals must show that his fear of future persecution on account of his ethnicity is objectively reasonable. *Fedosseeva v. Gonzales*, 492 F.3d 840, 847 (7th Cir. 2007). The record does not compel that finding. Other than the two random attacks, there is no evidence that Nosals had any other difficulties in Latvia because of his ethnicity. Furthermore, Nosals's parents and his brother continue to live in Latvia. Although Nosals testified that his parents found the message "Russians go away to your Russia" on their door, he admitted that they have not been harmed, arrested, or persecuted in any way. *See Guardia*, 526 F.3d at 972 (finding evidence that an applicant's family members remain unharmed in their home country supports a finding that the applicant is unlikely to suffer future persecution). In addition, while there may be some groups in Latvia that espouse hatred for non-ethnic Latvians, Nosals has not shown that the attitudes of those groups predominate in Latvia generally. *See Fedosseeva*, 492 F.3d at 847–48 (noting that Latvia has joined the European Union and NATO, that fifteen ethnic Russians are sitting in Latvia's 100-member parliament, and that the Latvian government is committed to protecting human rights). Substantial evidence therefore supports the BIA's finding that Nosals failed to show a well-founded fear of future persecution.

III.

The BIA's decision that Nosals failed to establish either past persecution or a well-founded fear of future persecution in Latvia is supported by substantial evidence. Accordingly, we DENY Nosals's petition for review.