# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3104

SERGEY BOROVSKY,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97-671-055

ARGUED APRIL 13, 2010—DECIDED JULY 26, 2010

Before WILLIAMS, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Sergey Borovsky petitions for review of an order of the Board of Immigration Appeals ("BIA") denying his application for withholding of removal and protection under the Convention Against Torture ("CAT"). We deny the petition.

## I. Background

Borovsky is a citizen of Ukraine, where he was born in 1980, and also of Israel, where his family relocated in 1993 and remained until 1997 when they left for Canada. After Borovsky's parents unsuccessfully applied for asylum in Canada, the family entered the United States illegally in 1998.

Borovsky and his family remained undocumented in the United States, apparently without incident, until 2003, when Borovsky was detained at a traffic stop in Kansas. Immigration officials discovered Borovsky's illegal status and initiated removal proceedings before the immigration court in Kansas City, Missouri. Borovsky applied for withholding of removal to his two countries of citizenship, Ukraine and Israel, and for CAT protection.

In proceedings before an Immigration Judge ("IJ"), the parties appeared in Kansas City, but the IJ participated from Chicago by video-conference. Borovsky testified about his childhood in Ukraine, where he, as the son of a Jewish father, was the target of anti-Semitic acts by his peers. His fellow school students and others called him derogatory, profane terms such as "Jeed" or "Jewish pig." Borovsky also claimed that he was beaten "many, many times" on account of his Jewish heritage. Borovsky did not offer many specifics but did recall one incident when other children tried to steal his bike and, when Borovsky resisted, beat him in the face. Another time, Borovsky's fellow students beat him in the school cafeteria for refusing to give up his bread, while onlookers yelled things like "kill that Jew."

Borovsky testified that his parents, too, received anti-Semitic threats, and a Star of David was chalked on the family's apartment door on several occasions. Borovsky's father told him that he frequently complained to local Ukrainian authorities, but they refused to help and even threatened reprisal if the complaints continued.

As for his fear of returning to Israel, Borovsky testified that he faced imprisonment for failing to register for mandatory military service before leaving the country in 1997, when he was 17 years old (one year younger than the mandatory service age of 18). In support of this fear, Borovsky offered a Web page with information on military desertion in a question-and-answer format; the questions were posted by several unidentified individuals and answered by a person purporting to be a justice officer in the Israeli Army. One question described a situation similar to Borovsky's, in which the individual left Israel with her parents before age 18 without registering for service. The officer's response was, "You[r] return to Israel will result in your arrest in the airport, military tribunal, prison, follow[ed] by service in the army."

In his oral decision, the IJ denied Borovsky's withholding of removal and CAT claims with respect to both Ukraine and Israel. The IJ credited Borovsky's testimony about his childhood abuse in Ukraine but concluded that this abuse did not rise to the level of "past persecution." The IJ further found that Borovsky failed to show that he would face "future persecution" in Ukraine. The IJ reviewed several background articles on anti-Semitism in

Ukraine submitted by Borovsky, including the U.S. State Department 2006 Country Report, the State Department 2007 International Religious Freedom Report, and a variety of articles from independent organizations. The IJ noted that the State Department reports indicated some anti-Semitic attacks in Ukraine, but these incidents were isolated and directed against Jews attending synagogues or holding religious services. Since Borovsky testified that he never intended to practice Judaism in Ukraine, the IJ concluded that it was unlikely that Borovsky would be singled out for persecution. The IJ also noted that the reported attacks were not initiated or condoned by the Ukrainian government, which investigated the attacks and made several arrests.

Addressing Borovsky's fear of imprisonment in Israel, the IJ found that Borovsky failed to show that he would face any punishment for simply leaving the country before reaching the age of mandatory military service. The IJ also found that any imprisonment that Borovsky might receive would not be "persecution" within the meaning of the immigration statutes, absent evidence that Israel would punish Borovsky's draft evasion disproportionately based on a protected trait such as his race or nationality. The IJ ordered Borovsky removed to Israel, or in the alternative, to Ukraine. Borovsky appealed to the BIA, which affirmed the IJ.

Borovsky petitioned this court for review. Prior to briefing, a dispute arose on whether venue was proper in the Seventh Circuit, since the IJ completed the proceedings in Chicago by video-conference, or the Eighth

Circuit, since the parties appeared in the immigration court in Kansas City. After a series of motions, the Attorney General conceded that venue was proper in this Circuit. *See Ramos v. Ashcroft*, 371 F.3d 948, 949 (7th Cir. 2004).

## II. Analysis

### A. Procedural Matters: Agency Decision and Harmless Error

We begin by deciding which decision—the IJ's, the BIA's, or both—we must review. We have stated that where "the BIA does not expressly adopt the IJ's findings but rather issues its own opinion, we review the BIA's decision alone." *Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008). "On the other hand, where the BIA's decision merely supplements the opinion of the IJ, 'the IJ's opinion, as supplemented by the BIA's opinion, becomes the basis for review.'" *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007) (quoting *Liu v. Ashcroft*, 380 F.3d 307, 311 (7th Cir. 2004)).

As Borovsky points out, the BIA's opinion contains no express words of adoption, but we do not think that such explicit language is always necessary to incorporate the IJ's decision as part of the agency decision under review. *Cf. id.* at 659 & n.1 (noting that the BIA had not expressly or implicitly adopted the IJ's opinion). The BIA's opinion, read in the context of the proceedings before the IJ, may show that the BIA simply adopted the IJ's reasoning rather than conduct its own, independent

analysis. Here, the BIA's opinion summarizes and agrees with each of the IJ's rationales, without discussing any alternative bases for denying Borovsky's claims. *Cf. Liu*, 380 F.3d at 311-12 (BIA disregarded the IJ's adverse credibility finding and denied the petition on alternative grounds). By implication, the BIA's opinion was only a supplement to the IJ's decision, so we will review the IJ's decision as supplemented. *See Tchemkou v. Gonzales*, 495 F.3d 785, 790 (7th Cir. 2007).

Next, we address a second procedural issue related to the venue confusion described above. Although the parties now agree that venue is proper in the Seventh Circuit, the BIA apparently assumed that Borovsky's petition was subject to Eighth Circuit, rather than Seventh Circuit, case law. In its opinion, the BIA cited two Eighth Circuit cases, *Pavlovich v. Gonzales*, 476 F.3d 613 (8th Cir. 2007), and *Suprun v. Gonzales*, 442 F.3d 1078 (8th Cir. 2006), when concluding that the threats and harassment that Borovsky experienced in Ukraine did not rise to the level of persecution. The BIA did not cite any Seventh Circuit cases.

The Attorney General concedes that the BIA should not have relied on Eighth Circuit case law but argues that the error was harmless. We agree. The BIA applied the standard for withholding of removal under the immigration regulations, 8 C.F.R. § 1208.16(b), and concluded that Borovsky failed to show "persecution" under that standard. Although the BIA bolstered its conclusion by citing a pair of Eighth Circuit cases, nothing suggests that the cited *Pavlovich* and *Suprun* cases were central to

the BIA's decision. The BIA did not discuss these cases, and from our own reading of them, they contain no point of immigration law that conflicts with Seventh Circuit precedent. And given our conclusion above that the BIA's analysis merely supplemented the IJ's decision (which relied on Seventh Circuit case law), the BIA's passing reference to Eighth Circuit case law is even less consequential.

Borovsky counters with the *Chenery* doctrine, under which a court cannot uphold an agency's decision on a ground not actually relied on by the agency. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). But our conclusion that the BIA's citation to Eighth Circuit case law was harmless is not the type of alternative ground barred by *Chenery*. The *Chenery* doctrine prevents a court from affirming an agency's inadequately justified decision "by substituting what it considers to be a more adequate or proper basis" for the decision. *Id.* So had the BIA mischaracterized the record in finding that Borovsky did not suffer persecution, *see Kadia v. Gonzales*, 501 F.3d 817, 822-23 (7th Cir. 2007), or relied on facts not rationally related to the issue of persecution, *see Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004), we could not simply scour the record to find some alternative basis to reach the same result.

Here, though, the BIA's apparent misunderstanding that Eighth Circuit law controlled does not undermine its primary ground of decision, that Borovsky failed to show persecution under the standard for withholding of removal (a standard generally applicable across all

circuits). We are confident that the BIA's Eighth Circuit case citations did not affect the outcome, and we decline to send this case back only to have the BIA excise those citations from its opinion, replace them with a pair of Seventh Circuit cases, and reissue a substantially identical opinion denying Borovsky's claims.

### B. Withholding of Removal and CAT Protection

Moving to the merits of Borovsky's petition, we review the denial of his claims for withholding of removal and CAT protection under the deferential "substantial evidence" standard. We will uphold the agency's decision "if it is supported by reasonable, substantial, and probative evidence" and reverse only if the record "compels" a contrary result. *Moab*, 500 F.3d at 660 (quotations omitted).

To qualify for withholding of removal, an applicant must show a "clear probability" that his life or freedom would be threatened on account of a protected trait. *Prela v. Ashcroft*, 394 F.3d 515, 519 (7th Cir. 2005). The applicant may satisfy this burden by showing that he suffered "past persecution" in the country of removal, in which case a rebuttable presumption arises that he would again be persecuted there. 8 C.F.R. § 1208.16(b)(1)(i). Absent a showing of past persecution, the applicant must demonstrate that it is more likely than not that he will suffer future persecution if removed. *Id.* § 1208.16(b)(2).

We begin with Borovsky's claim for withholding of removal to Ukraine. Borovsky attempted to show past

persecution through his testimony on the anti-Semitic attacks, insults, and threats that he endured as a child. This childhood abuse was unfortunate, but we must conclude that it was not severe enough to compel a finding of past persecution.

As for the attacks, although physical abuse need not cause serious injury to constitute persecution, abuse that is more frequent and severe will more likely compel a finding of persecution. *Tarraf v. Gonzales*, 495 F.3d 525, 534-35 (7th Cir. 2007). Borovsky claimed that he was beaten "many times" by his fellow schoolchildren and others, but he provided detailed accounts on only two beatings: one when he refused to give up his bike and another in the school cafeteria when he refused to give up his bread. The IJ could conclude that these acts of apparent bullying, which were short-lived and resulted in no extensive injury, did not rise to the level of persecution. *See Prela*, 394 F.3d at 518 (multiple detentions, beatings, and harassment did not compel finding of past persecution); *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (three-day detention and beating that caused a swollen face did not compel finding of past persecution).

The anti-Semitic insults of "Jeed" and "Jewish pig" that Borovsky recalled, while offensive, also did not rise to the level of persecution. Derogatory name-calling rarely if ever surpasses mere harassment to persecution. *See Kaharudin v. Gonzales*, 500 F.3d 619, 623 (7th Cir. 2007) (name-calling, spitting, hitting with rocks, and touching on the buttocks fell "far short of persecution"). Regarding

the other threats described by Borovsky, in order to constitute past persecution, these threats must be "most immediate" or the perpetrators must have attempted to follow through on them. *Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006). Borovsky referred to a series of unspecified threats against him and his family, as well as frequent chalking of the Star of David on the family's apartment door. Without more evidence that these threats presented an imminent risk of harm, they did not compel a finding of past persecution. *See id.* (threat to blow up a political opponent's home was not persecution in the absence of actions to follow through); *Ahmed v. Gonzales*, 467 F.3d 669, 674 (7th Cir. 2006) (verbal threats that never led to actual harm were mere harassment).

In addition to past persecution, Borovsky attempted to show a likelihood of future persecution in Ukraine through a series of background articles on anti-Semitism in the country. An initial problem with Borovsky's claim is that he failed to establish that the acts reported in the articles were attributable to the Ukrainian government. Discrimination may constitute persecution only if the government perpetrates it or is "unable or unwilling to protect [the applicant] from the responsible parties." *Tarraf*, 495 F.3d at 528 n.2. The articles submitted by Borovsky did not indicate that the Ukrainian government condoned or was unable to combat anti-Semitism. Although the articles described several crimes against Jews that never led to arrests or prosecutions, they also reported other such crimes to which the government response was swift and effective. According to

the State Department 2006 Country Report and the 2007 International Religious Freedom Report, acts of anti-Semitism led to multiple arrests by law enforcement, as well as widespread condemnation by Ukranian religious leaders. These reports provided the IJ with substantial evidence to conclude that Borovsky did not satisfy the state-action requirement of his persecution claim. (We add parenthetically that the most recent 2009 State Department Country Report, which was not before the IJ, describes a downward trend in attacks against Jews coupled with an upward trend in official and public condemnation of anti-Semitism.)

Even if the reported acts of anti-Semitism could be attributed to the Ukrainian government, Borovsky did not show that it is more likely than not that he would be targeted for persecution. The background articles focused on acts that were isolated in nature and directed toward openly practicing Jews, such as vandalism of Jewish synagogues or attacks against Jews attending religious ceremonies. The IJ thought it unlikely that Borovsky would be singled out for such an attack, since he never had and did not intend to practice Judaism in Ukraine. The record supports this reasoning, and Borovsky has not shown a likelihood of future persecution in Ukraine.

Besides Ukraine, Borovsky also seeks withholding of removal to Israel based on his fear of imprisonment for failing to perform mandatory military service. Initially, we credit the IJ's conclusion that Borovsky failed to establish that he would face any prison time for simply

leaving Israel before he was 18 years old, the age when his mandatory service obligation began. In support of his fear of imprisonment, Borovsky offered only a single Web page containing the opinion of a person identified as a justice officer in the Israeli Army. This source was not authoritative enough to compel the finding that Borovsky would be imprisoned upon his return to Israel. *Cf. Pelinkovic v. Ashcroft*, 366 F.3d 532, 538 (7th Cir. 2004) (single article on sporadic attempts to punish draft evaders failed to show that applicants would be punished). Although the Web page provided the name and title of the authoring officer, it provided no information on his background, authority to determine punishment for military desertion, or the legal sources that he relied on. Also, the terse nature of the officer's responses does little to bolster this source's reliability. In response to a question posted by an individual similarly situated to Borovsky, the officer simply stated, "You[r] return to Israel will result in your arrest in the airport, military tribunal, prison, follow[ed] by service in the army." Responses to other queries were similarly brief and invariably concluded that the person would face prison time.

Even assuming that Borovsky would face imprisonment for military desertion, Borovsky failed to show that such imprisonment would amount to persecution. "[I]t is well established that governments may draft citizens for military service and punish those who avoid the draft." *Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir. 2004). In order for such punishment to become "persecution," the government must punish the

applicant more severely than other draft evaders based on some protected trait. *Id.* As the IJ correctly noted, Borovsky had no evidence that the Israeli government would single him out for draft evasion based on a protected trait such as his religion or nationality. In the absence of such disproportionate treatment, Borovsky cannot base his withholding of removal claim on any imprisonment that he might receive for draft evasion.

In his final argument, Borovsky re-presents his fear of imprisonment for military desertion as a claim for relief under the CAT. In his view, it would be "torture" to imprison him for failing to perform mandatory military service.

The burden for CAT protection is no less stringent than that for withholding of removal; the applicant must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture" is defined as the intentional infliction of "severe pain or suffering" for the purpose of coercion, punishment, or discrimination. *Id.* § 208.18(a)(1). Torture does not include "lesser forms of cruel, inhuman or degrading treatment or punishment," *id.* § 208.18(a)(2), or suffering inherent to "lawful sanctions" imposed for violating the law, *id.* § 208.18(a)(3). Borovsky offered no evidence that any imprisonment that he might receive for violating Israeli military service law would involve an "extreme form of cruel and inhuman treatment." *Id.* § 208.18(a)(2); *see also Pavlyk v. Gonzales*, 469 F.3d 1082, 1090-91 (7th Cir. 2006) (rejecting a CAT claim based on prison conditions of overcrowding,

lack of adequate sanitation and medical facilities, and mistreatment by police). The agency properly denied his claim for CAT protection.

### III.  Conclusion

We DENY the petition for review.