# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-1833

———————

| | |
|---|---|
| Volodymyr Fisher; Irina Nikolaeva, | * |
| | * |
| Petitioners, | * |
| | * |
| v. | * Petition for Review of a Decision of |
| | * the Board of Immigration Appeals. |
| Immigration and Naturalization | * |
| Service, | * |
| | * |
| Respondent. | * |

———————

Submitted:  December 13, 2001

Filed:  May 28, 2002

———————

Before WOLLMAN,[1] Chief Judge, JOHN R. GIBSON, and MAGILL, Circuit Judges.

———————

JOHN R. GIBSON, Circuit Judge.

The question for review is whether Volodymyr Fisher and his wife, Irina Nikolaeva, have established that they qualify as refugees from religious or ethnic persecution.  Fisher and Nikolaeva applied for asylum in the United States, claiming past persecution and a well-founded fear that they would suffer future persecution on

———————

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002.  He has been succeeded by the Honorable David R. Hansen.

account of Fisher's German ethnicity and Lutheran religion if they were repatriated to the Ukraine. An Immigration Judge and the Board of Immigration Appeals denied their application on the ground that the record established only ethnic or religious discrimination against Fisher, not persecution. Because that finding is supported by substantial evidence, we deny Fisher and Nikolaeva's petition for review of the Board's decision.

Fisher and Nikolaeva came to this country from the Ukraine. Fisher was born in Uzbekistan in 1937. His father was an ethnic German and his mother was Russian. He moved to the Ukraine in 1957, to attend the Aviation Institute in Kiev. There, he married Nikolaeva, an ethnic Russian, in 1962, and the couple lived in Kiev until they came to this country in 1995 on visitor visas.

On May 30, 1996 Fisher and Nikolaeva applied for asylum, citing ethnic and religious persecution of Fisher as an ethnic German and as a Lutheran. Fisher is the principal asylum applicant, and his wife's claim depends on his. The couple sought withholding of deportation as well as asylum.

At the asylum hearing, much of Fisher's testimony recounted incidents and patterns of discrimination occurring during the Soviet era. The government of the Ukraine changed fundamentally following the breakup of the Soviet Union. The 1996 Ukrainian Constitution and a 1991 Law on Freedom of Conscience and Religion provide protection for religious freedoms, and current citizenship laws encourage the existence of a multi-ethnic country.

Fisher's claims of ethnic persecution are predicated both on his identity as a German, and on the perception by other Ukrainians that anyone with a German name is Jewish. Fisher contends that he was denied various educational and career opportunities as a result of his German ethnicity. However, Fisher testified that he was educated after high school, first at the Aviation Institute in Riga and then for five

and a half years at the Aviation Institute in Kiev. He was employed as an engineer in Kiev until he left for the United States.

Fisher also testified that he was frequently insulted with anti-Jewish slurs by neighbors and co-workers. Fisher explained to people that he was not Jewish, but he did not feel that they believed him. Once, just before he left the Ukraine, he passed by a demonstration of Ukrainian nationalists who were making anti-Semitic arguments. Fisher began arguing with the protesters, telling them that what they said was "a lie." Three young protesters pushed him, told him to leave, and threatened to follow him and burn his apartment.

After Fisher left the Ukraine, apparently without advising his employer that he was not coming back to work, he received a letter from the employer asking why he had been absent from work. The letter continued, "Please return the company assets you possess (radio transceiver "Len," microcontrollers, power supply, etc.) If the assets will not be returned, you will be taken to a court of law." Fisher testified that he did not have any company property, and that after he wrote his employer a letter saying that he was staying in the United States, his employer had taken no further action during the intervening three years.

Fisher's claims of religious persecution stem from his activities in reviving the Lutheran church in Kiev after the break up of the Soviet Union. Fisher and about fifteen others applied for registration of a church and contacted the German Lutheran Church in Munich for help in finding a pastor. Fisher received some aid from the church in the form of food and clothing. When this became known at the Mathematics Institute where he worked, his salary was dramatically reduced, by four fifths or more. A deputy of the Institute told Fisher privately that his salary was suspended because he was receiving money from the church. For two years after that, the Lutheran pastor shared some of his salary with Fisher. Fisher tried to challenge the suspension of his salary through court proceedings, but the receptionist at the

court told him his case would not be considered because he was getting money through the church and didn't need his salary. The receptionist also suggested he should be paying taxes on money he received through the church.

Fisher also testified that he believed the KGB had infiltrated his church in Kiev, because this was the only way he could explain the statements and actions of some of his fellow parishioners.

Fisher reported some problems in connection with his attempt to obtain property that had belonged to Lutheran congregations, but had been confiscated during the communist era. He recounted efforts to establish a claim to a Lutheran church house, a gymnasium, and a parsonage. He met with the Ukrainian Minister of Minorities, who assured him that the property would be turned over to his parish. The most the congregation got was one room in the church. Fisher continued his efforts, but he received a phone call from the Minister of Minority's office saying that Fisher's activities were "complicating and bringing tension into the relationship between the community and the government," and suggesting that Fisher keep silence. Fisher also reported a veiled threat of violence from a deputy in the bureau that was occupying the parsonage that Fisher wanted to reclaim for his church and a threat from yet another official that Fisher would run into problems at work if he pursued claims on church property.

The church Fisher helped organize has grown from around 40 members at the time Fisher left the Ukraine to about 400 to 500 members at the time of the hearing.

Fisher testified that if he returned to the Ukraine, he would be eligible for a pension unless criminal charges were brought against him. Nikolaeva qualified for a pension and began receiving payments before the couple left the Ukraine.

Fisher and Nikolaeva's adult daughter remains in the Ukraine. According to Fisher, after he and Nikolaeva left for the United States, their daughter was fired from her job because her employer inferred that if her parents were in the United States, she did not need the money from her job. Also, someone broke into the daughter's apartment. Fisher volunteered the opinion that the burglars probably thought the daughter would have valuable goods from the United States in the apartment.

On March 10, 1997, the INS filed Orders to Show Cause why Fisher and Nikolaeva should not be deported. Fisher and Nikolaeva conceded deportability, and so the hearing focused only on their application for asylum. After a hearing, the Immigration Judge denied Fisher and Nikolaeva's application for asylum.

The Judge found that Fisher and Nikolaeva had not established that they had been subject to past persecution on account of ethnicity or religion or that they had a well-founded fear of future persecution on those grounds. Nikolaeva herself had "never been subjected to anything remotely approaching consideration as persecution." The Judge found that Fisher's claims that his educational and job opportunities had been curtailed because of his ethnicity did not rise to the level of persecution, in light of the fact that Fisher had been permitted to attend the aviation institutes in Riga and Kiev. Moreover, Fisher was continuously employed in the Ukraine until he left for this country. The Judge held that whatever ethnic discrimination Fisher had faced was not severe enough to constitute persecution.

The evidence of past religious discrimination also fell short of persecution. Fisher had been actively involved in his church while living in the Ukraine. Fisher's primary complaint was that he had not been able to obtain the return of the Lutheran property to his congregation. Although he was only partly successful in getting the property turned over to his congregation, Fisher had never been arrested, detained, interrogated by authorities, or convicted of any crime.

-5-

The Immigration Judge also found that there was not an objective basis for Fisher to fear future persecution. The incident with the nationalist protesters was only one incident, with no documentation in the record. The letter from his employer did not appear to be threatening or persecutory, but was instead an understandable response to an employee's absence from work. There was nothing in the State Department's report on the Ukraine that would substantiate the claim that ethnic Germans are currently being persecuted. Nor did the record support the contention that the Ukrainian government was preventing its people from practicing their religions. Fisher's claim of pay cuts was more likely explained by economic problems within the Ukraine than by religious persecution.

Fisher and Nikolaeva appealed, and the Board of Immigration Appeals affirmed. In re Volodymyr G. Fisher and Irina V. Nikolaeva, No. A75 016 872 and A75 016 871 (B.I.A. Mar. 14, 2001). In addressing Fisher's claim that his salary was reduced after he began working for the church, the Board noted that potential job loss and generalized economic disadvantage are not severe enough to rise to the level of persecution. Moreover, the Board found there was no clear causal connection between the salary loss and Fisher's religion. Fisher testified that he would be eligible for a pension, and his wife was already receiving a pension when they left the Ukraine. Furthermore, in the years before he left the Ukraine, Fisher was working for the Lutheran church for some remuneration. Therefore, the Board concluded that the record did not show economic deprivations severe enough to constitute a threat to Fisher's life or freedom. It dismissed Fisher and Nikolaeva's appeal. The couple then petitioned this court for review.

Because the proceedings in this case were begun before April 1, 1997, the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act

of 1996,[2] and a final deportation order was issued after October 1, 1996, judicial review is governed by the former 8 U.S.C. § 1105a (1994), and by the Reform Act's transitional rules. Menjivar v. INS, 259 F.3d 940, 941 n.1 (8th Cir. 2001); Reform Act, 110 Stat. 3009-546, at § 309. Under the old section 1105a, the ultimate decision to grant asylum is discretionary, and thus we review the Board of Immigration Appeals' denial of asylum for abuse of discretion. Feleke v. INS, 118 F.3d 594, 597-98 (8th Cir. 1997). But if the Board's denial of asylum rests on the determination that Fisher was not eligible for asylum, that determination is a finding of fact reviewed under the substantial evidence standard. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Meguenine v. INS, 139 F.3d 25, 27 (1st Cir. 1998). We may not grant the petition for review unless the record "was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." Elias-Zacarias, 502 U.S. at 481. The court reviews the Board's legal conclusions de novo, with the caveat that where it is appropriate under administrative law principles to defer to the agency's interpretation of the body of law it administers, we do so. Meguenine, 139 F.3d at 27.

The law governing Fisher and Nikolaeva's asylum claim is found in 8 U.S.C. § 1158 (1994), as it existed before the Reform Act. The Reform Act amendments apply to asylum applications filed on or after April 1, 1997, see Note to 8 U.S.C. § 1158 (2000) (applicable the first day of the first month beginning more than 180 days after September 30, 1996), whereas the application in this case was filed on May 30, 1996. We therefore will be citing and applying the pre-Reform Act version of the asylum statute.

The Attorney General is authorized to grant asylum to aliens in this country or at our borders who qualify as refugees, which includes "any person who is outside

---

[2]Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30 1996), as amended by the Extension of Stay in United States for Nurses Act of October 11, 1996, Pub. L. No. 104-302, § 2, 110 Stat. 3656.

any country of such person's nationality . . . and is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158 and 1101(a)(42)(A). An alien seeking asylum bears the burden of proving that he or she is a refugee. 8 C.F.R. § 208.13(a) (2001).[3]

To prove that the applicant suffers from a well-founded fear of future persecution, the applicant must show an actual subjective fear, as well as an objective basis for that fear, such that "a reasonable person in the alien's position would fear persecution if returned to the alien's native country." Menjivar, 259 F.3d at 941 (internal quotation marks omitted).

Past persecution is relevant either because it provides a basis for a well-founded fear of future persecution, or, in extreme cases, because the severity of past treatment may form part of a compelling reason for the alien's unwillingness to return to the site of such persecution. See 8 C.F.R. § 208.13(b)(1); Francois v. INS, 283 F.3d 928, 930-31 (8th Cir. 2002). However, past persecution may fail to establish a well-founded fear of future persecution, if the government shows conditions have so changed since the time of persecution that the applicant's history of persecution is no longer probative of current conditions. See 8 C.F.R. § 208.13(b)(1)(i) (past persecution establishes presumption that can be rebutted by preponderance of evidence); see Kratchmarov v. Heston, 172 F.3d 551, 553 (8th Cir. 1999).

Persecution involves a threat to one's life or freedom on account of one of five protected grounds–race, religion, nationality, membership in a particular social group, or political opinion. See Minwalla v. INS, 706 F.2d 831, 835 (8th Cir. 1983); 8 U.S.C. § 1101(a)(42)(A) (enumerating five grounds). Fisher has not adduced

---

[3]8 C.F.R. § 208.13 was amended effective January 5, 2001; throughout this opinion we refer to the earlier version.

substantial evidence that his life or freedom have been jeopardized because of his religion or ethnicity. Instead, he contends that he has suffered and is likely to suffer economic disadvantages imposed upon him for invidious reasons. We have said that "mere economic detriment is not sufficient" to establish persecution. Minwalla, 706 F.2d at 835; Nyonzele v. INS, 83 F.3d 975, 983 (8th Cir. 1996); Feleke, 118 F.3d at 598.

Fisher's evidence of economic disadvantage failed with respect to both causation and severity. The Board determined that the evidence did not establish that the reduction in Fisher's salary resulted from his religion. Although the Board did not venture an alternative explanation, the Immigration Judge found, "The chaotic situation of the Ukrainian currency is a more likely explanation for these problems." Fisher's testimony is unclear, but he seems to have acknowledged that others around him had experienced salary cuts, although he said his was the worst he knew of. Furthermore, the Board observed that Fisher had other resources, such as his pension, his wife's pension, and the money he received from his pastor. Therefore, the reduction in salary was not so severe as to threaten Fisher's life or freedom. These factual determinations are supported by the record.

The evidence was clear that Fisher was allowed to practice Lutheranism in the Ukraine, and by all accounts his local parish is thriving. As evidence of persecution, Fisher points to the government's failure to promptly surrender to his congregation buildings confiscated from Lutherans during the communist era, but he admits that his congregation was allowed to use a room in a church building, and that he was promised more. The State Department's Ukraine Country Report on Human Rights Practices for 1997 states that the government had moved to return confiscated church property, but that the process was "stalled" in many places. The Board could certainly conclude that a slow or incomplete restitution process did not amount to religious persecution.

Fisher's other complaints of ethnic discrimination against him do not rise to the level of persecution. He was permitted to complete extensive post-secondary education at two aviation institutes and was employed as an engineer until he left the Ukraine. As for slurs and harassment from private individuals, these do not constitute persecution. See Mikhailevitch v. INS, 146 F.3d 384, 389-90 (6th Cir. 1998). The one episode of threats and physical roughness that occurred when Fisher injected himself into the midst of an ultra-nationalist rally does not require the Board to find persecution. See Nyonzele, 83 F.3d at 983 ("Evidence of isolated violence . . . is not sufficient."). Fisher relies heavily on Korablina v. INS, 158 F.3d 1038 (9th Cir. 1998), and In re O-Z and I-Z, Int. Dec. 3346, 1998 WL 177674 (BIA April 2, 1998), in which Jews from the Ukraine were found to have been persecuted. These cases are readily distinguishable, since in both cases the applicants and their families were subjected to repeated physical violence. Substantial evidence supports the Board's determination that Fisher has not suffered persecution in the past.

Nor is there a reasonable ground for Fisher to fear persecution in the future. The letter from Fisher's employer threatening court proceedings if he did not return the employer's property is not persecutory on its face, and the Immigation Judge observed that after Fisher explained his whereabouts, the employer had taken no further action against him.

Viewing the evidence and Fisher's various other contentions together, the Board's determination that Fisher and Nikolaeva are not eligible for asylum is well supported on the record as a whole. Because they have failed to carry the lesser burden of proving eligibility for asylum, it follows that they have also failed to establish a right to withholding of deportation. Francois, 283 F.3d at 932-33. Accordingly, we must deny review.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.