# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2894

_____

Alga Ogbay Woldemichael; Nazrawi    *
Yemane Abraham,    *
   *
       Petitioners,    *
   *    Petition for Review of an
     v.    *    Order of the Board of
   *    Immigration Appeals.
John Ashcroft, Attorney General of    *
the United States of America,    *
   *
       Respondent.    *

_____

Submitted: January 13, 2006
Filed: June 5, 2006

_____

Before LOKEN, Chief Judge, McMILLIAN[*] and MELLOY, Circuit Judges.

_____

LOKEN, Chief Judge.

Alga Ogbay Woldemichael, a 54-year-old citizen of Eritrea, and her young son, Nazrawi Yemane Abraham, entered the United States in September 1999 on non-immigrant visas and applied for asylum, withholding of removal, and relief under the Convention Against Torture, claiming that Woldemichael would be persecuted as a Jehovah's Witness if removed to Eritrea. An immigration judge (IJ) denied the

_____

[*]The Honorable Theodore McMillian died on January 18, 2006. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

application after a hearing. The Board of Immigration Appeals affirmed without opinion. Woldemichael petitions for judicial review of the final agency action. We deny the petition.

## I.

Woldemichael was the only witness who testified at the hearing. She testified that she lived with her Greek Orthodox family until 1985 in Eritrea, a 48,000 square-mile part of Ethiopia that became an independent nation in 1993. She began secretly worshiping as a Jehovah's Witness in 1984 after a friend introduced her to the religion. When her mother discovered a cassette tape containing Jehovah's Witness prayers, the family demanded that Woldemichael abandon her belief or leave home. Woldemichael moved to Khartoum, Sudan, where many Eritreans were living to avoid the growing conflict between Ethiopians and Eritreans. She found work and later met and married Yemane Abraham Tekle, an Orthodox Christian from Eritrea. When Tekle found work in Saudi Arabia, the couple moved to Riyadh in 1987, where Woldemichael worked as a housekeeper until her son was born in 1993.

In 1992, Woldemichael encountered the friend who introduced her to the Jehovah's Witness religion. The two resumed regular worship at the American and Italian embassies in Riyadh with other Eritean and Ethiopian Jehovah's Witnesses. According to Woldemichael, though she and the friend occasionally worshiped at home, she concealed her religious beliefs from her husband because he disapproved of Jehovah's Witnesses. In 1999, Tekle discovered Woldemichael's religious literature, became furious and abusive, and ultimately obtained a divorce from the Eritrean embassy because Woldemichael was "not the same religion." The divorce ended Woldemichael's authorization to work in Saudi Arabia. She and her son obtained non-immigrant visas to the United States with the help of a Saudi businessman. After entering the United States in New York City, they lived with cousins in Sioux Falls, South Dakota, and then moved to Worthington, Minnesota.

Woldemichael also submitted affidavits from elders of the Jehovah's Witness church stating that she regularly attended Sunday service, Bible study, and classes teaching the life of Jesus while in Sioux Falls and Worthington. The cousins with whom she lived in Sioux Falls submitted affidavits supporting Woldemichael's testimony that she is cut off from her family in Eritrea because of her religion.

The administrative record also includes Department of State reports addressing the conditions facing Jehovah's Witnesses in Eritrea since that country gained its independence in 1993. The most recent Country Report in the record reports:

> The [Eritrean] Constitution provides for the freedom to practice any religion . . . and Islam and most forms of Christianity are practiced and tolerated widely throughout the country with persons free to worship at the church or mosque of their choice; however, the Government continued to harass, detain, and discriminate against members of the small community of Jehovah's Witnesses because of their refusal, on religious grounds, to vote in the referendum on independence or to perform national service. . . . This has led to widespread criticism that members of Jehovah's Witnesses collectively were shirking their civic duties. . . . Although persons from other religious groups, including Muslims, reportedly have been punished in past years for failure to participate in national service, only members of Jehovah's Witnesses have been subject to dismissal from the civil service, had their trading licenses revoked, been evicted from government-owned housing, and been denied passports, identity cards, and exit visas. However, there were no reports that Jehovah's Witnesses who performed national service and participated in the national independence referendum were subject to discrimination.

The Department of State's International Religious Freedom Report for 2002 states that the Eritrean population is approximately 50% Sunni Muslim and 40% Orthodox Christian and includes similar information concerning the treatment of Jehovah's Witnesses in Eritrea.

In a Written Decision following the asylum hearing, the IJ explained that Woldemichael suffered no past persecution in Eritrea and therefore must establish a well-founded fear of future persecution to prevail on her asylum claim. Though acknowledging "a pattern and practice of discrimination and persecution against Jehovah's Witnesses in Eritrea," the IJ expressed "serious concerns regarding whether [Woldemichael] is indeed a Jehovah's Witness" -- her failure to become baptized in Eritrea, Saudi Arabia, or the United States; the unlikelihood that she could keep her religious affiliation secret from her husband for twelve years; the representation that she was a Christian rather than a Jehovah's Witness on her son's birth certificate in Saudi Arabia; and the fact that the affidavits from Jehovah's Witness elders stated that Woldemichael attended services in Sioux Falls and Worthington but not that she was a member of their church. The IJ concluded that Woldemichael is ineligible for asylum because "[i]t is highly unlikely that a person in [her] position, a person who tenuously holds the tenets of the Jehovah's Witness faith, will be persecuted if returned to Eritrea." Alternatively, the IJ denied asylum as a matter of discretion because Woldemichael bypassed orderly refugee procedures. "She left Eritrea in 1985 and lived in Sudan from 1985-1987 and in Saudi Arabia from 1987-1999. [She] was not fleeing persecution when she came to the United States in 1999; rather, she was forum shopping." The IJ denied withholding of removal and relief under the Convention Against Torture but granted voluntary departure despite the adverse credibility finding.

## II.

Woldemichael frames the primary issue for our review as whether the IJ erred in finding that she is not a Jehovah's Witness based upon a flawed adverse credibility finding. This misstates, or at least obscures, the relevant asylum analysis.

The Attorney General may, in his discretion, grant asylum to a "refugee," an alien who is outside her native country and is unable or unwilling to return to that

country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). "Persecution" is a rigorous standard -- "the infliction or threat of death, torture, or injury to one's person or freedom on account of a statutory ground such as religion." Rife v. Ashcroft, 374 F.3d 606, 612 (8th Cir. 2004) (quotation omitted). Absent physical harm, subjecting members of an unpopular faith to hostility, harassment, discrimination, and even economic deprivation is not persecution unless those persons are prevented from practicing their religion or deprived of their freedom. See Nagoulko v. I.N.S., 333 F.3d 1012, 1016 (9th Cir. 2003).

A finding of past persecution creates a presumption of a well-founded fear of future persecution, but Woldemichael presented no evidence of past persecution. Indeed, she has not lived in Eritrea since it became a nation. Without the aid of the presumption, an asylum applicant may prove a well-founded fear of future persecution by showing an objectively reasonable fear of *particularized* persecution. See Feleke v. I.N.S., 118 F.3d 594, 598 (8th Cir. 1997). Here, Woldemichael presented no evidence of the particular circumstances she may face if removed to Eritrea, other than evidence that she is cut off from her immediate family, an unfortunate circumstance but one which is not relevant to the persecution inquiry. Thus, Woldemichael may prove a well-founded fear only by showing:

> (A) . . . that there is a pattern or practice in . . . her country . . . of persecution of a group of persons similarly situated to the applicant on account of . . . religion . . . and (B) . . . her own inclusion in, and identification with, such group of persons such that . . . her fear of persecution upon return is reasonable.

8 C.F.R. § 208.13(b)(2)(iii). "A pattern or practice of persecution must be systemic, pervasive, or organized." Ngure v. Ashcroft, 367 F.3d 975, 991 (8th Cir. 2004).

The only pattern and practice evidence in the administrative record is found in the above-quoted Department of State reports. As the IJ noted, those reports suggest a pattern or practice of discrimination and persecution by the Eritrean government. But adverse action is only taken against Jehovah's Witnesses *who refused to vote for independence and refuse to obey the requirement of national service.* Other Jehovah's Witnesses, the Department of State reports, are allowed to practice their religion and have not been fired from the civil service and denied identity cards and passports. Thus, Woldemichael failed to prove that she is a member of the particular group that has been subjected to persecution. She was not a resident of Eritrea eligible to vote at the time of independence, and there is no evidence she opposed her countrymen's efforts to form a new nation. There likewise is no evidence that Woldemichael, now 54 years old, would be eligible for national service if removed to Eritrea at this time and therefore no basis to fear she would be singled out for harsh treatment as a Jehovah's Witness who refuses national service. Compare Ghebremedhin v. Ashcroft, 385 F.3d 1116, 1120 (7th Cir. 2004). Finally, her sporadic and "tenuous" connections to the Jehovah's Witness organized religion provide no basis to infer that she is the kind of "actively participating" member of the faith who would suffer persecution in a country that professes religious tolerance as a national policy and does not bar Jehovah's Witnesses from worshiping in their churches and private homes. See Prokopenko v. Ashcroft, 372 F.3d 941, 946 (8th Cir. 2004).

For these reasons, substantial evidence in the administrative record as a whole supports the IJ's ultimate finding that Woldemichael failed to present credible evidence that she is a member of a group that is subjected to a pattern or practice of religious persecution in Eritrea. Given the focused nature of Eritrea's hostility toward Jehovah's Witnesses, the issue is not whether Woldemichael is a "true believer" of that faith. See Muhur v. Ashcroft, 355 F.3d 958, 960 (7th Cir. 2004). Rather, the issue is whether she proved that she is similarly situated to those Jehovah's Witnesses who are targeted for harassment and discrimination. See Woldemeskel v. I.N.S., 257 F.3d 1185, 1191 (10th Cir. 2001). Woldemichael failed to satisfy this rigorous

burden. Therefore, she is ineligible for asylum. In these circumstances, we need not address the IJ's alternative decision to deny the application for asylum as a matter of discretion, a ruling that we would review for abuse of discretion. <u>See</u> 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.14(a); <u>Farbakhsh v. I.N.S.</u>, 20 F.3d 877, 882 (8th Cir. 1994).

For the same reasons, Woldemichael's application for withholding of removal and for relief under the Convention Against Torture were properly denied. <u>See</u> 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 208.16(b)(2), 208.16(c)(2). Accordingly, we deny the petition for review.

_____