# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1630

_____

Harold Makatengkeng; Frengky W.    *
Makatengkeng,    *
   *
       Petitioners,    *
   *
   *    Petition for Review of an Order
    v.    *    of the Board of Immigration
   *    Appeals.
Alberto Gonzales, Attorney General    *
of the United States of America,    *
   *
       Respondent.    *

_____

Submitted: November 16, 2006
Filed: August 3, 2007

_____

Before LOKEN, Chief Judge, MELLOY, Circuit Judge, and SCHILTZ,[1] District Judge.

_____

MELLOY, Circuit Judge.

Harold Makatengkeng ("Makatengkeng") and his now-adult son, Frengky Makatengkeng,[2] natives and citizens of Indonesia, overstayed their non-immigrant

_____

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota, sitting by designation.

[2]Despite his adulthood, Frengky Makatengkeng was treated as a derivative beneficiary on his father's application for relief because he was younger than twenty-

visitor visas. After being charged as removable, Makatengkeng applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied all three applications, and the Board of Immigration Appeals ("Board") adopted and affirmed the decision of the IJ. The Board also denied Makatengkeng's "motion to admit evidence on appeal." Makatengkeng now petitions our court for review. We deny the petition.

I.    Background

Harold Makatengkeng arrived in the United States on July 4, 2002, as a non-immigrant visitor. He overstayed his visa. On June 30, 2003, immigration authorities commenced removal proceedings against Makatengkeng by serving him with a notice to appear. At a master calender hearing on September 10, 2003, Makatengkeng admitted removability and indicated his intent to file a combined application for asylum,[3] withholding of removal, and CAT relief. The IJ held a final removal hearing on November 2, 2004.

---

one years old on the date his father applied for asylum. See 8 U.S.C. § 1158(b)(3)(B). Because Frengky's claim for asylum and related relief derives entirely from his father's claim, we refer only to Harold Makatengkeng in our discussion.

[3]Makatengkeng filed a pro se asylum application with the Immigration Service Asylum Office, which was received sometime in February or March of 2003. Shortly thereafter, immigration officials registered Makatengkeng for the National Security Entry-Exit Registration System ("NEESRS"), and placed him in removal proceedings. Accordingly, the Immigration Service Asylum Office did not adjudicate his initial asylum application. With the IJ's permission, Makatengkeng filed a second asylum application after his master calender hearing.

A.    Factual Background

Makatengkeng and his wife, Reni Mare, both testified at the removal hearing. We recount the substance of their testimony here. Makatengkeng was born in Bitung, North Sulawesi, Indonesia, in 1957. Makatengkeng suffers from albinism and blurry vision; since living in the United States, he has been declared legally blind.

Starting when he was young, Makatengkeng was treated differently because of his albinism. In school, Makatengkeng was insulted daily by the other students and the teachers hit him because his poor eyesight prevented him from performing the work he was given. As an adult, the insults and abuse continued. People called Makatengkeng "budo," an insult that means, according to Makatengkeng, "somebody that is a disgrace." People also called Makatengkeng "londo," the Java word for "Dutch." Because the Dutch colonized Indonesia, being called Dutch is an insult. After she married Makatengkeng, Mare, who is not an albino, was subjected to the same insults. Mare's relatives tried unsuccessfully to prohibit her from marrying Makatengkeng because, "people like [him] usually have no future." Makatengkeng's children were also insulted in school and in the streets because of their father's condition. They were called "abnormal people," or "budo," and people laughed at them because their father was white. Sometime people would scream at them, calling them "stupid" or "londo."

Makatengkeng graduated from high school; upon graduation, however, he was unable to find employment. According to his testimony, no one would hire him because "of my situation like this. There is no way I can do anything." Makatengkeng and his family were supported by his parents until he was able to start his own business servicing electronics. He had no formal training in electronics, but he learned the trade from his neighbor. Makatengkeng earned enough from his business to support his family.

Makatengkeng never suffered serious physical abuse, but he testified that people pulled the hair on his arms and removed the hat that he had to wear to protect his pale skin from the sun. Children and even some adults would throw rocks at Makatengkeng and his family every day when they went out, although never causing injury. Makatengkeng never reported these incidents to police; Mare testified that generally all the police are Muslim, and therefore it would do no good to report the discrimination and abuse the family suffered because Makatengkeng, Mare, and their children are Christians.

Makatengkeng moved around Indonesia, trying "to find peace." He moved from Bitung to Surabaya, East Java, back to Bitung, then to Sorong, West Irian Jaya, back to Bitung again, to Sorong again, and, finally, to Jakarta. He and his family were insulted every place they lived.

Makatengkeng and his family attended church in Jakarta, Bitung, and Sorong. In 1999, the pastor of Makatengkeng's church in Jakarta prohibited the congregation from having services for approximately three months. The pastor closed the church because he received a flyer from people in the community threatening the church. No one told the police about this incident because "usually the police are Muslim so there is no use." Also in 1999, Makatengkeng's cousin, who lived in a different area of Indonesia, was killed because of his Christian faith. During the time at issue, Makatengkeng testified, "all the Christians in that area [of eastern Indonesia] were killed." Makatengkeng never lived in this region.

Makatengkeng testified that after the United States attacked Afghanistan, he felt terrified to leave the house. Because of his skin condition, some people in Indonesia thought he looked American, and he feared that the anger shown against the United States in daily demonstrations would be taken out on him. No one ever attacked him, but people warned him that he should "be careful when [he] walk[ed] outside because they will think you are American." Makatengkeng testified that, after receiving his

visa on April 5, 2001, he was even more afraid of staying in Indonesia. He did not arrive in the United States until July 4, 2002, however, because he wanted his son to finish school.

To support his claims for relief, Makatengkeng submitted the following: documents corroborating his family's involvement in a Christian church in Indonesia; a letter from the Pentecostal Church of Indonesia in Minnesota; materials relating to his medical treatment from the Minnesota state services for the blind; a copy of his Indonesian identity card, which identifies him as a Christian; and news articles relating violence in Indonesia. The administrative record also included the U.S. State Department 2003 Country Report on Indonesia ("Report").

B.     The IJ's Decision

The IJ found Makatengkeng and Mare to be credible. According to the IJ, the documents Makatengkeng provided confirmed that Makatengkeng is a Christian and that he has serious eye problems relating to his albinism. The IJ noted that "the main issue in the case relates to [Makatengkeng's] medical condition" and found little evidence to support a claim of persecution based on religious affiliation.

Starting with the asylum claim, the IJ found that Makatengkeng is a member of a particular social group because of his medical condition. According to the IJ, "[a]lbinism is an immutable characteristic that [Makatengkeng] is incapable of changing. It clearly identifies him on sight." The court then determined that Makatengkeng did not show that he had suffered past persecution. The IJ cited Fisher v. INS, 291 F.3d 491, 497 (8th Cir. 2002), for the proposition that "persecution involves a threat to one's life or freedom on account of one of the protected bases under the [Immigration and Nationality] Act." The IJ determined that Makatengkeng "was essentially the victim of social discrimination," which does not amount to past persecution under the law. The IJ also found that Makatengkeng could not establish

a well-founded fear of future persecution because the insults regarding his appearance did not "involve a serious threat to his life or freedom."

The IJ likewise found that Makatengkeng could not meet the higher burden of proof required for a grant of withholding of removal.

The IJ then moved to Makatengkeng's claim under the CAT. The IJ found that the people Makatengkeng fears in Indonesia "are essentially general members of society who have taunted and harassed him because of his physical appearance." The IJ concluded that without any government involvement or evidence that Makatengkeng ever went to the authorities to complain about his condition, "[t]here simply is insufficient evidence in the record to establish that it is more likely than not that the government of Indonesia or someone acting with the acquiesce of the government would want to harm [Makatengkeng]."

On September 20, 2005, after he had submitted his brief to the Board, Makatengkeng filed a motion to the Board to "admit evidence on appeal." Makatengkeng sought to introduce two pieces of evidence: (1) a statement from his siblings regarding the country conditions in Indonesia, and (2) a recent diagnosis he received showing that he suffered from skin cancer. As an appendix to the motion, Makatengkeng attached a letter from his diagnosing doctor, dated July 8, 2005, which stated that Makatengkeng's skin cancer was a result of "growing up and living in the tropics" with albinism. The letter stated that Makatengkeng "is at great risk for further skin cancer if he remains in a tropical area, and he is also at risk for melanoma, which can be deadly." In his motion, Makatengkeng argued that his skin cancer diagnosis demonstrated that "he [would] face additional hardship" if he was removed to Indonesia. He asked the Board to admit and consider the additional evidence based on "the principle of fundamental fairness and the interests of justice," or, alternatively, to remand the case to the IJ.

-6-

On February 13, 2006, the Board adopted and affirmed the IJ's decision, adding that "[t]he concept of persecution does not encompass every sort of treatment that our society regards as offensive, unfair, unjust, or even unlawful or unconstitutional." Regarding Makatengkeng's motion to "admit evidence on appeal," the Board treated the motion as a motion to reopen, and found that "the allegations and submissions on appeal do not meet the requirements for such a motion." The Board dismissed Makatengkeng's appeal and denied his motion. The Board mentioned that the type of "hardship" relief Makatengkeng appeared to be seeking with the introduction of the new evidence would be more relevant in an application for cancellation of removal.

## II.    Discussion

We review the Board's factual determinations for substantial evidence. Mamana v. Gonzales, 436 F.3d 966, 968 (8th Cir. 2006). In order for us to reverse the Board's decision, Makatengkeng "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 483-84 (1992). "Where, as here, the BIA adopts the IJ's decision and adds its own reasoning, we review both decisions together." Quomsieh v. Gonzales, 479 F.3d 602, 605 (8th Cir. 2007).

### A.    Asylum

The Attorney General has discretion to grant asylum to a refugee. 8 U.S.C. § 1158(b)(1)(A). "Refugee" is defined as a person who is outside his country of nationality and is unable or unwilling to return to that country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42)(A).

"A finding of past persecution creates a presumption of a well-founded fear of future persecution" on the same grounds. Woldemichael v. Ashcroft, 448 F.3d 1000, 1003-04 (8th Cir. 2006); 8 C.F.R. § 208.13(b)(1). Without the benefit of the presumption, "an asylum applicant may prove a well-founded fear of future persecution by showing an objectively reasonable fear of particularized persecution." Woldemichael, 448 F.3d at 1004 (emphasis omitted). The fear must also be "subjectively genuine." Eta-Ndu v. Gonzales, 411 F.3d 977, 983 (8th Cir. 2005). To meet the subjective element, the petitioner must show that he genuinely fears persecution; this may be proven by testimony that the IJ deems credible. Id. To satisfy the objective element, the petitioner must produce "credible, direct, and specific evidence that a reasonable person in [his] position would fear persecution if returned." Mamana, 436 F.3d at 968.

### 1. Particular Social Group

As a threshold matter, we have doubts as to whether Makatengkeng can show that albino Indonesians qualify as a "particular social group" for asylum purposes. Makatengkeng argues that he was persecuted on two grounds: his medical condition and his Christianity. The IJ found, and we agree, that there is little substance to his claim of persecution based on his religion.[4] Therefore we will focus on Makatengkeng's claim that he has faced, and fears he will face, persecution on account of his albinism.

---

[4]The only evidence of religious persecution particular to Makatengkeng is his testimony regarding the closure of his church for two weeks in 1999. Further, while the experience of certain members of Makatengkeng's family and the Report demonstrate that Christians in certain regions are subject to considerable violence, Makatengkeng never lived in any of these regions, and he testified that, if removed, he would not live in these regions.

The IJ found that Makatengkeng's "medical condition" made him a member of a particular social group because "[a]lbinism is an immutable characteristic that [he] is incapable of changing," and because "[i]t clearly identifies him on sight."[5] We are troubled by the IJ's determination that Makatengkeng's "medical condition"—his albinism and the medical disabilities that come with it—is a particular social group. See Raffington v. INS, 340 F.3d 720, 723 (8th Cir. 2003) (holding that "mentally ill Jamaicans, or mentally ill female Jamaicans" do not "qualify as a 'particular social group' for asylum purposes") (quoting Safaie v. INS, 25 F.3d 636, 640 (8th Cir. 1994)). However, because we find for other reasons that relief is unwarranted, we accept, for purposes of this opinion, the IJ's determination that Makatengkeng's albinism places him within a particular social group.

### 2. Past Persecution

We move next to the IJ's determination that the harassment and hardship Makatengkeng suffered in Indonesia did not rise to the level of persecution. The Immigration and Nationality Act ("INA") does not define "persecution," but our court has held that persecution involves "the infliction or threat of death, torture, or injury to one's person or freedom on account of a statutory ground . . . ." Woldemichael, 448 F.3d at 1003 (quotation omitted); see Fisher, 291 F.3d at 497 ("Persecution involves a threat to one's life or freedom on account of one of five protected grounds . . . .").

"Low-level intimidation and harassment alone do not rise to the level of persecution." Berte v. Ashcroft, 396 F.3d 993, 996 (8th Cir. 2005). Further, although mental or emotional injury can support a claim for persecution, "persecution is an

---

[5]At oral argument the government seemed to concede the fact that Makatengkeng was a member of a particular social group.

extreme concept." Shoaira v. Ashcroft, 377 F.3d 837, 844 (8th Cir. 2004) (holding that "the psychological damages [the petitioner] received from the rough treatment of the [government] authorities and from witnessing her father's arrest on three occasions does not rise to the level of persecution") (quotation omitted).

Makatengkeng argues that the economic discrimination he faced in Indonesia amounts to past persecution. Further, he contends that the insults and harassment he suffered, when examined in the aggregate, rise to the level of persecution. For the following reasons, we disagree.

We first discuss Makatengkeng's argument that he suffered economic persecution. Makatengkeng contends that the level of economic hardship he suffered in Indonesia, on account of his albinism, amounted to economic persecution. Makatengkeng and his wife testified that, despite having completed high school, no one would hire him to perform any job. Makatengkeng faced the same problems every place he lived in Indonesia. Further, he testified that his now-deceased brother, who was an albino, also could not find work.

Our circuit's case law regarding economic persecution is not as developed as that in other circuits. Claims of economic persecution are often embedded with claims of other forms of hardship and discrimination, where petitioners, like Makatengkeng, ask us to aggregate their experiences and find persecution. See Fisher, 291 F.3d at 497. One exception to this general pattern is Ahmed v. Ashcroft, 396 F.3d 1011 (8th Cir. 2005). Id. at 1012 (reviewing a claim that economic discrimination against the petitioners' ethnic group amounted to persecution). In Ahmed, we stated that, "[e]conomic discrimination has been held to rise to the level of persecution if such sanctions are sufficiently harsh to constitute a threat to life or freedom." Id. at 1014. The petitioners in Ahmed contended that they had "a fear of persecution based on the system of allocating government jobs in Pakistan." Id. at 1013. The Board found that the petitioners "had not shown anything more than fear of economic hardship or lack

of educational opportunities, which was not sufficient to constitute persecution," and we agreed. Id. at 1013, 1014-15. While the number of governmental positions may have been limited, there was no evidence that the petitioners' ethnic group was "altogether disqualified from such work," because other evidence left "open the possibility of private employment." Id. at 1014. Additionally, none of the petitioners had ever lost a job in Pakistan because of their ethnicity. Id.

Our decision in Ahmed referenced two other cases in which we stated that a petitioner's allegations of economic hardship did not rise to the level of economic persecution: Nyonzele v. INS, 83 F.3d 975 (8th Cir. 1996) and Minwalla v. INS, 706 F.2d 831 (8th Cir. 1983). In Nyonzele, the petitioner testified that if he was deported, his "opportunities for advanced education and a good job will be non-existent." Id. at 983. We upheld the Board's decision that the petitioner had not proven a well-founded fear of persecution by showing economic discrimination, stating, "[f]ears of economic hardship or a lack of educational opportunities . . . do not establish a well-founded fear of persecution." Nyonzele, 83 F.3d at 983.

Likewise, in Minwalla, we affirmed the Board's determination that a petitioner's allegations did not establish a well-founded fear of persecution. Minwalla, 706 F.2d at 835. We stated that "[p]ersecution requires a showing of a threat to one's life or freedom," and that "[m]ere economic detriment is not sufficient." Id.

Makatengkeng urges us to adopt the test espoused by the Ninth Circuit in Kovac v. INS, 407 F.2d 102 (9th Cir. 1969), and adopted by several other courts, which states that to rise to the level of persecution, economic hardship "need not necessarily threaten the petitioner's life or freedom," but, rather, a showing of a "probability of deliberate imposition of substantial economic disadvantage," can be sufficient. Koval v. Gonzales, 418 F.3d 798, 805-06 (7th Cir. 2005) (quotation omitted); Kovac, 407 F.2d at 107 ("[A] probability of deliberate imposition of

-11-

substantial economic disadvantage upon an alien [for the statutory reasons] is sufficient to confer upon the Attorney General discretion to withhold deportation.").

We note that the Board has recently clarified its standard for economic persecution. See In re T-Z-, 24 I. & N. Dec. 163 (B.I.A. 2007). In that case, the Board rejected the idea that a person seeking asylum based on economic persecution must "demonstrate a total deprivation of livelihood or a total withdrawal of all economic opportunity in order to demonstrate harm amounting to persecution." Id. at 173. The Board stated that in considering economic persecution, it determines whether the petitioner faced the "deliberate imposition of *severe* economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." Id. at 171 (emphasis added). Thus, the Board stated, to the extent that the Kovac line of cases use the phrase "*substantial* economic disadvantage" to establish a lesser standard than the word "severe," it rejects that formulation and "endorse[s] the . . . requirement that an applicant for asylum must demonstrate a 'severe economic disadvantage.'" Id. at 173 (emphasis added).

Except in a few circumstances, our court has continued to require a showing that allegations of economic hardship threaten the petitioner's life or freedom in order to rise to the level of persecution. See Quomsieh, 479 F.3d at 606 ("Absent physical harm, the incidents of harassment, unfulfilled threats of injury, and economic deprivation are not persecution."); Zhuang v. Gonzales, 471 F.3d 884, 890 (8th Cir. 2006) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution."); Berte, 396 F.3d at 996 ("[M]ere economic detriment is not sufficient to qualify as persecution.") (quotation omitted); Fisher, 291 F.3d at 495-97 (approving the Board's decision that "the record did not show economic deprivations severe enough to constitute a threat to [petitioner's] life or freedom"); but see Bellido v. Ashcroft, 367 F.3d 840, 843 (8th Cir. 2004) (stating that persecution "is a fluid concept that does not necessarily require the applicant to prove that his life or freedom has been or will be directly jeopardized").

-12-

In the proper case, it might be appropriate for our court to revisit the standard for proving economic persecution; this, however, is not that case. Simply stated, Makatengkeng's allegations do not rise to the level of economic persecution under any of the standards discussed above. Makatengkeng asserts that, despite having a high school diploma, he was unable to find work because of his albinism. Having no way to support his family, Makatengkeng first relied on his parents (who are now deceased). However, Makatengkeng was then able to start his own business servicing electronics. He had no formal training in electronics; he testified that he learned his trade from a neighbor. Makatengkeng's electronic business was successful. He was able to make enough money to support his wife (who did not work outside the home) and his two children. Evidence of this ability supports the IJ's finding of no past persecution. The employment discrimination Makatengkeng faced in Indonesia on account of his albinism does not rise to the level of persecution, even under the standard Makatengkeng urges us to adopt.

Makatengkeng's other complaints of discrimination on account of his albinism likewise do not rise to the level of persecution, see Fisher, 291 F.3d at 495, 497 (holding that "slurs and harassment from private individuals . . . do not constitute persecution," and noting that the petitioner "had never been arrested, detained, interrogated by authorities, or convicted of any crime"), even when examined in the aggregate. Cf. In re O-Z- & I-Z-, 22 I. & N. Dec. 23, 26 (B.I.A. 1998) (holding that the incidents alleged by the petitioner, "[i]n the aggregate, . . . rise to the level of persecution as contemplated by the [INA]"). Makatengkeng and his family were called names and yelled at on a daily basis. People threw rocks at them while they were walking down the street, pulled at the hairs on Makatengkeng's arms and pulled off his hat. There is no doubt that Makatengkeng and his family were subject to harassment. However, "persecution does not encompass mere harassment." Ivanishvili v. U.S. Dep't of Justice, 433 F.3d 332, 341 (2d Cir. 2006); see also id. (defining harassment as "words, conduct, or action (usually repeated or persistent) that, being directed at a specific person, annoys, alarms, or causes substantial

-13-

emotional distress in that person and serves no legitimate purpose") (quotation and alterations omitted). Further, as the IJ noted, Makatengkeng was never physically injured, he was never arrested or detained, he was never prevented from going to school, none of his property was ever destroyed, and he was never denied any government services on account of his albinism.

There is substantial evidence supporting the Board's finding that Makatengkeng did not suffer past persecution.

### 3. Well-Founded Fear of Future Persecution

Further, we find that Makatengkeng has not proven a well-founded fear of persecution in the future, economic or otherwise. Both Makatengkeng and his wife testified that they feared life in Indonesia would be the same as it was when they left: people would insult them, Makatengkeng would be unable to find a job, and they would have no peace. The IJ found that their fear was credible. Again, however, even in the aggregate, the repercussions Makatengkeng fears do not rise to the level of persecution.

Specifically regarding his fear of future economic persecution, Makatengkeng argues that because his eyesight has deteriorated in the years since he left Indonesia, he will not be able to re-establish his electronics-servicing business if he returns. Medical records show that, even with corrective lenses, Makatengkeng is legally blind. Makatengkeng's prospects upon returning to Indonesia appear to be worse than when he left. While this fact is troubling, we find nothing in the record that permits us to reverse the IJ and the Board's decisions. Makatengkeng has a well-founded fear of economic hardship, not economic persecution; this is not enough to support an asylum claim. See Feleke v. INS, 118 F.3d 594, 598 (8th Cir. 1997) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution.").

-14-

Alternatively, a finding of a well-founded fear of persecution would also require the determination that Makatengkeng fears harm "inflicted either by the government of [a country] or by persons or an organization that the government [is] unable or unwilling to control." Valioukevitch v. INS, 251 F.3d 747, 749 (8th Cir. 2001); see Kimumwe v. Gonzales, 431 F.3d 319, 322-23 (8th Cir. 2005) ("Actions by private parties are not attributable to the government, absent a showing that the harm is inflicted by persons that the government is unwilling or unable to control."). Although the IJ did not make a specific finding as to the role of the Indonesian government or its inability or unwillingness to control private actors in connection with Makatengkeng's asylum claim, the IJ did make a finding regarding government involvement in its discussion of Makatengkeng's claim under the CAT. We find little evidence in the record compelling a finding other than the one the IJ made: that the people Makatengkeng "fear[s] in Indonesia are essentially general members of society who have taunted and harassed him because of his physical appearance." There is nothing in the record indicating that the Indonesian government inflicted harm on Makatengkeng or was unable or unwilling to control those who harassed Makatengkeng.

Because Makatengkeng "failed to satisfy the relatively lower burden of proof on his asylum claim" with regard to the severity of the alleged persecution, Mamana, 436 F.3d at 969, and because his other claims for relief rely upon the same arguments, we hold that his claims for withholding of removal and relief under the CAT fail as well.

III.    Motion to Admit Evidence on Appeal

Regarding his "motion to admit evidence on appeal," Makatengkeng focuses on the letter from his treating physician discussing Makatengkeng's diagnosis of skin cancer; we will do the same. Makatengkeng argues that this evidence "is particularly relevant to [his] application for asylum . . . in that [he] established that he had been

-15-

previously denied medical treatment in Indonesia." Makatengkeng contends that the Board erred by failing to consider the additional evidence and by mischaracterizing the evidence as an attempt to qualify for cancellation of removal.[6] He also argues that the Board erred by not reviewing his medical condition as a hardship factor pursuant to 8 C.F.R. § 208.13(b)(1)(iii)(B).

The Board properly treated Makatengkeng's motion as a motion to reopen pursuant to 8 C.F.R. § 1003.2. We review the Board's denial of a motion to reopen and remand for an abuse of discretion. Eta-Ndu, 411 F.3d at 986. A motion to reopen "shall not be granted unless . . . evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ." 8 C.F.R. § 1003.2(c)(1).

The Board denied Makatengkeng's motion to reopen, finding "that the allegations and submissions on appeal do not meet the requirements for such a motion." The Board stated that Makatengkeng's claim of "'hardship' is not an element of establishing eligibility for asylum."

We agree with the Board that Makatengkeng's skin cancer diagnosis is not material to his application for asylum, withholding of removal, or CAT relief. Makatengkeng attempts to link the diagnosis with his testimony that doctors in Indonesia said they could do nothing for his albinism, and he argues that this fact adds to his claim of a well-founded fear of future persecution. The current diagnosis does not prove a failure to diagnose by doctors in Indonesia. Makatengkeng's fear that the medical care he will receive in Indonesia will not be as effective as the care he would

---

[6]Makatengkeng concedes that he is not eligible for cancellation of removal. See 8 U.S.C. § 1229b(a) (stating that "[t]he Attorney General may cancel removal . . . if the alien . . . (2) has resided in the United States continuously for 7 years after having been admitted in any status, and (3) has not been convicted of any aggregated felony").

-16-

receive in the United States is not a fear of persecution. Evidence of Makatengkeng's diagnosis of skin cancer would not have changed the outcome of any of his claims. See Berte, 396 F.3d at 997 ("Even if the evidence was previously unavailable, the BIA will remand only if the evidence is of such a nature that the Board is satisfied that . . . the new evidence would likely change the result in the case.") (quotation omitted).

As to Makatengkeng's argument that the Board erred by not reviewing his medical condition as a hardship factor pursuant to 8 C.F.R. § 208.13(b)(1)(iii)(B), we note that this provision "requires a showing of past persecution." Akhtar v. Gonzales, 406 F.3d 399, 406 (6th Cir. 2005). Makatengkeng has not made that showing here.

The Board did not abuse its discretion in denying Makatengkeng's motion to reopen.

IV.    Conclusion

The facts of this case are sympathetic. As distasteful as it may be to send someone with Makatengkeng's medical issues back to a country where he and his family will undoubtedly face harassment and discrimination, "Congress has delegated this judgment to the Executive Branch." Pavlovich v. Gonzales, 476 F.3d 613, 619 (8th Cir. 2007). After carefully reviewing the administrative record and the decisions of both the IJ and the Board, we conclude that substantial evidence supports the decision to deny asylum, withholding of removal, and CAT relief. "That is the extent of our judicial review authority." Id. Accordingly, we deny the petition for review.

SCHILTZ, District Judge, concurring in part and concurring in the judgment.

I reluctantly agree that the petition for review should be denied. I cannot, for the life of me, comprehend why the United States has chosen to devote its scarce prosecutorial resources to ensuring that a middle-aged, law-abiding, blind albino is

sent back to Indonesia — where, because of the color of his skin, he is certain to be treated brutally and likely to face starvation. At the very least, the government's decision "seems contrary to the traditions of this great Nation." Pavlovich v. Gonzales, 476 F.3d 613, 619 (8th Cir. 2007). But we have sworn to enforce the law as it is, not as we wish it to be. Congress has given the Executive Branch the authority to deport Makatengkeng, and, as long as the Executive Branch does not act unlawfully in exercising that authority, we have no basis to interfere.

For the reasons given in the careful and well-reasoned majority opinion, I agree that the Executive Branch has not acted unlawfully in seeking to remove Makatengkeng. I join all of the majority opinion, with the exception of those portions of § II(A)(3) in which the majority holds that Makatengkeng has not established a well-founded fear of future economic persecution.

I agree that, under Eighth Circuit precedent, economic discrimination (such as the refusal to give someone a job) does not rise to the level of economic persecution unless it poses "a threat to life or freedom." Ahmed v. Ashcroft, 396 F.3d 1011, 1014 (8th Cir. 2005). I hope that, in an appropriate case, the Eighth Circuit will revisit this standard, which appears harsher than the standard now applied by the Board, see In re T-Z-, 24 I. & N. Dec. 163, 173 (B.I.A. 2007), and harsher than the standard applied in other circuits, see, e.g., Li v. Att'y Gen., 400 F.3d 157, 168 n.7 (3d Cir. 2005). But I believe that, even under the Eighth Circuit's strict "threat-to-life" standard, Makatengkeng has established a well-founded fear of future economic persecution.

Makatengkeng has proven that, if he is returned to Indonesia, his life will be threatened by the economic discrimination that he will face. Nothing in the record contradicts Makatengkeng's evidence that he will not be able to find employment because of his albinism. Likewise, nothing in the record contradicts Makatengkeng's evidence that the consequence of this discrimination will be to leave Makatengkeng without any means to support himself. (Because of his blindness, Makatengkeng can

-18-

no longer earn a living by working at home, as he did before he came to the United States.)  I believe that Makatengkeng has thus established more than a well-founded fear of "economic hardship," as in <u>Ahmed</u>, 396 F.3d at 1013, or "[m]ere economic detriment," as in  <u>Minwalla v. INS</u>, 706 F.2d 831, 835 (8th Cir. 1983).  I believe that Makatengkeng has established a well-founded fear of starvation, which meets the Eighth Circuit's "threat-to-life" standard.

That said, Makatengkeng must prove more than that he will be persecuted; he must prove that the persecution that he will face will be inflicted by the government or by persons that the government is unable or unwilling to control.  <u>Menjivar v. Gonzales</u>, 416 F.3d 918, 921 (8th Cir. 2005).  Mere government inaction is not enough to meet this standard; instead, the persecution must in some way bear the "'imprimatur'" of the government.  <u>Setiadi v. Gonzales</u>, 437 F.3d 710, 713-14 (8th Cir. 2006); <u>Menjivar</u>, 416 F.3d at 921 (quoting <u>Valioukevitch v. INS</u>, 251 F.3d 747, 749 (8th Cir. 2001)).  I agree with the majority that the economic persecution that Makatengkeng will face will not carry the imprimatur of the Indonesian government. Rather, that persecution will be entirely the result of individual decisions made by private citizens acting on their own prejudices against light-skinned Indonesians generally and albinos in particular.  I therefore agree that the petition for review must be denied.

_____